[No. A042136. First Dist., Div. Five. Nov. 20, 1990.]

In re the Marriage of WILLIAM D. and PATRICIA C. SMITH.
WILLIAM D. SMITH, Appellant, v.
PATRICIA C. SMITH, Appellant.

COUNSEL

Leland, Parachini, Steinberg, Flinn, Matzger & Melnick, Merrill E. Steinberg and Richard Sherman for Appellant Wife.

Richmond & Chamberlin, Diana Richmond, Hardin, Cook, Loper, Engel & Bergez and Ronald A. Wagner for Appellant Husband.

OPINION

KING, J.—In this case we hold that before a motion for upward modification of spousal support can be considered the moving party must prove that the prior order, when made, was insufficient to meet his or her reasonable needs as measured by the applicable guidelines set forth in Civil Code section 4801, subdivision (a), or that the reasonable cost of satisfying those needs has increased. If this is shown, the moving party must then prove the obligor's ability to pay increased spousal support.

We also hold that the marital standard of living is to be weighed under the circumstances of the case along with all other applicable factors contained in Civil Code section 4801, subdivision (a), in reaching a fair and reasonable result on the issue of spousal support. We hold that the marital standard of living is intended by the Legislature to mean the general station in life enjoyed by the parties during their marriage. The Legislature did not intend it to be a precise mathematical calculation, but rather a general reference point for the trial court in deciding this issue.

The trial court possesses broad discretion in determining the issue of spousal support but must exercise discretion weighing all of the applicable guidelines of section 4801, subdivision (a). Having done so, the trial court may fix spousal support at an amount greater than, equal to or less than what the supported spouse may require to maintain the marital standard of living, in order to achieve a just and reasonable result under the facts and circumstances of the case.

## I. INTRODUCTION

Patricia C. Smith (Pat) appeals, and William D. Smith (Bill)[1] cross-appeals, from an order modifying monthly spousal support by almost

---

[1] We use the parties' first names to assist the reader in following the opinion. In Pat's briefs, she refers to the parties as Pat and Bill. In Bill's briefs, "for convenience," he refers to the

doubling it from $1,700 to $3,300. Pat contends the court was mandated to increase monthly support to $7,317 to enable her to live at the standard of living established during the marriage. Bill contends support should not have been increased at all because (1) there was no showing of a material change of circumstances since the prior order and (2) there was no showing that the prior order when made did not meet Pat's needs consistent with the marital standard of living. We affirm.

## II. Facts and Proceedings

### A. *Dissolution and Initial Support Orders in 1977.*

Bill and Pat married in 1961 and had three children, all of whom are now adults. They separated in March 1976, and the marriage was dissolved with a marital settlement agreement in March 1977.

Bill is an actuary by profession and is a partner in a major actuarial firm. He earned a healthy income before separation. In 1974, he earned a salary of $63,333 plus a bonus of $38,000; in 1975 a salary of $78,000 plus a $30,350 bonus; in 1976 a salary of $78,000 plus a $10,500 bonus.

To earn this income, however, Bill worked excessive hours. In 1974, he worked 2,000 billable hours, in 1975 he logged 1,831 billable hours, and in 1976 he put in 1,635 billable hours. In addition to billable hours, he had to spend at least 800 hours each year on administrative matters. Thus, for example, in 1974 Bill worked 2,800 hours, or (excluding a modest amount of vacation and holidays) nearly 60 hours a week.

In addition, it is undisputed that the family was living beyond its reasonable means. Bill's salary was the sole source of family income. In 1971, the parties sold their home in Berkeley for $28,000 and bought a very large home in Piedmont for $112,000. Bill testified that the new home "was vastly more than a wage earner in my position should have tackled." At one point they incurred some $50,000 in extraordinary home maintenance expenses.

parties as husband and wife. Since they have now been divorced for over 14 years, it seems inappropriate to call them husband and wife, especially since Bill has a present wife. Referring to them as appellant and respondent, or even worse appellant and cross-respondent and respondent and cross-appellant, would be impersonal to the parties and unduly confusing to the reader. Referring to the parties by their first names personalizes the opinion for the parties and, for other readers, makes the opinion easier to understand. As distinguished from other civil cases where parties may be partnerships, corporations, associations or governmental entities, the parties in marital dissolution actions are human beings and we use their first names, in part, to humanize a decision resolving personal legal issues which seriously affect their lives.

The house "remained in a fairly constant state of dilapidation as we couldn't afford to restore it."

Bill further testified that in addition to the excessive housing expense, family expenditures "were out of control." Pat's spending habits in 1975 and 1976 were such that "money was just flowing through the family coffers." For example, during an 11-month period in 1975, Pat spent some $10,000 on her own clothing.

The 1977 marital settlement agreement provided Bill would pay monthly family support of $1,200 plus the mortgage on the Piedmont home until it was sold. The home was sold later that year for $325,000, from which Pat received $113,000. Pat and the two remaining minor children moved to Hawaii, where she bought a house for $135,000. In 1978, by stipulation, monthly family support was increased to $2,300.

## B. Stipulated Modification in 1982.

Support was modified once more in June 1982, again by stipulation. By this time all three children were adults and attending college for which Bill was expending considerable sums. Bill was working fewer hours. In 1981, he billed 1,493 hours, earning a salary of $90,000 with no bonus. At the time of the stipulation he had a monthly income of $8,120. (Ultimately, for the full year 1982 he billed 1,350 hours, earning a salary of $110,000 with a bonus of $46,525.) Pat, in contrast, had no earned income. She obtained a real estate license in 1980 and tried for two years to sell real estate, but earned no money whatsoever. Pursuant to the stipulation the court ordered Bill to pay monthly spousal support of $1,700, plus monthly payments of $560 to Pat's creditors for 21 months.

## C. 1987 Modification From Which This Appeal Is Taken.

The present dispute arose in 1987, when Pat again requested modification of monthly spousal support. By this time Bill's income had increased substantially, and since his children had completed college he no longer had that expense. In 1986, he billed 1,256 hours, earning a salary of $156,000 with a bonus of $36,775. In 1987, his salary was $155,000 with a bonus of approximately $47,000. His 1988 income was expected to be comparable. He had remarried in 1984, and his wife earned a yearly income of approximately $55,000.

Pat, in contrast, was unemployable. She was 59 years old, with back problems and an apparent reading disability. She had sold her house in Hawaii in 1986 and returned to California, where she wanted to buy anoth-

er house. From the sale of the Hawaii house she had received $165,000, of which she had $120,000 left. At the time of the 1982 modification, when she had been living in Hawaii, her monthly housing expense was $1,079, and she had no medical or dental expenses other than monthly health insurance payments of $45. In a November 1987 income and expense declaration, in which she "projected" the expenses she contended she required to live in a manner comparable to her marital standard of living, she estimated a monthly housing expense of $1,930 and, since she no longer had health insurance, monthly medical and dental expenses of $500. She also estimated increases from 1982 in her monthly clothing, entertainment and vacation expenses totalling $1,250.

Pat initially sought an increase in monthly spousal support to $9,918. She later asserted she would require monthly support of $7,317 in order to produce an after-tax income equivalent to the total monthly expenses of $5,510 she projected in her November 1987 income and expense declaration.

At the hearing on Pat's motion, she argued that to the extent Bill's income permitted, she was entitled to an amount of spousal support that would enable her to live at the actual standard of living established before separation; because Bill had substantially greater income than in 1982 and could now afford to support her at the precise marital standard of living, the court as a matter of law was mandated to order the increase she sought. Her appeal is primarily based upon the contention that the trial court failed to apply the correct legal principle, with a fallback position that the court also abused its discretion in fixing the amount it ordered for spousal support. Stated another way, Pat's primary contention on appeal is that Bill's income level left the court without any discretion; it had to award her the amount she projected she needed to achieve the same standard of living she believed she enjoyed during the marriage.

The court rejected this argument, concluding in a statement of decision that the marital standard "must be reasonable, and the court accepts [Bill's] contention that he was overworked and the family was spending beyond its reasonable means in the years prior to separation." The court further concluded there was insufficient evidence to establish what would have been a reasonable standard of living for the parties in 1975 and hence what would be a comparable standard in 1987-1988.

The court did, however, grant an increase in monthly spousal support from $1,700 to $3,300. The court explained in its statement of decision that the 1982 modification "appears to acknowledge that $1,700 per month was not sufficient spousal support," since Pat had incurred additional expenses

which Bill had agreed to pay at the rate of $560 per month for 21 months. Bill's income had increased substantially since 1982, "and now he has the ability to satisfy [Pat's] reasonable needs." The court concluded that an increase to $3,300 was justified in light of Pat's "1982 financial circumstances, the 1982 court proceedings and some adjustments that should be made to account for clothes, entertainment and medical care."

Pat appeals from the order modifying spousal support, and Bill cross-appeals.

### III. DISCUSSION

#### A. *Background and Legal Overview of Spousal Support.*

The appeal in the instant case requires an examination of the considerations to be taken into account in deciding one of the most important yet most difficult issues in a family law case: spousal support. Guidelines to be applied by trial courts are supplied by the Legislature in Civil Code section 4801, subdivision (a),[2] and by appellate court decisions. (*In re Marriage of Davis* (1983) 141 Cal.App.3d 71 [190 Cal.Rptr. 104].) Our recently retired colleague Justice Betty Barry-Deal, a knowledgable authority on family law, in her last published opinion has carefully traced the evolution of section 4801, subdivision (a), since its adoption as part of the Family Law Act in 1970. (*In re Marriage of Smith & Ostler* (1990) 223 Cal.App.3d 33 [272 Cal.Rptr. 560].) Because Justice Barry-Deal has provided us with the complete history of the changes in legislative guidelines to be considered by trial courts in determining the issue of spousal support, there is no need to repeat that history here.

■ "[Section] 4801(a), while giving the court broad *discretion* over spousal support . . . imposes a set of *mandatory guidelines* that the court 'shall' consider in making its determination. As indicated, spousal support orders that do not reflect a weighing of these statutory factors are subject to reversal for *abuse of discretion*. [*Marriage of Fransen* (1983) 142 C.A.3d 419, 190 C.R. 885—abuse of discretion to base support award strictly on difference between expenses and income without considering statutory standards]." (Hogoboom & King, Cal. Prac. Guide: Fam. Law (Rutter 1989) § 6:86, p. 6-96.16, italics in original; see also, *In re Marriage of Prietsch & Calhoun* (1987) 190 Cal.App.3d 645 [235 Cal.Rptr. 587].)

■ The trial court is bound to consider the guidelines contained in section 4801, subdivision (a), "but the ultimate decision rests within the

---

[2] All further statutory references are to the Civil Code.

court's 'broad discretion.' A trial court's exercise of discretion will not be disturbed on appeal unless, *as a matter of law*, an abuse of discretion is shown—i.e.,—where, considering all the relevant circumstances, the court has 'exceeded the bounds of reason' or it can 'fairly be said' that no judge would reasonably make the same order under the same circumstances. [*Marriage of Morrison* (1978) 20 C.3d 437, 143 C.R. 139; *Marriage of Epstein* (1979) 24 C.3d 76, 154 C.R. 413; *Marriage of Sinks* (1988) 204 C.A.3d 586, 251 C.R. 379; *Marriage of Laube* (1988) 204 C.A.3d 1222, 251 C.R. 745.]" (Hogoboom & King, *supra*, at § 6:79, p. 6-96.14, italics in original; see also *In re Marriage of Bukaty* (1986) 180 Cal.App.3d 143 [225 Cal.Rptr. 492].)

■ The propriety of an order modifying spousal support "rests within the trial court's sound discretion. So long as the court exercised its discretion along legal lines, its decision will not be reversed on appeal if there is substantial evidence to support it. [*Marriage of Wilson* (1988) 201 C.A.3d 913, 247 C.R. 522; *Marriage of Crobarger* (1986) 178 C.A.3d 56, 223 C.R. 480.]" (Hogoboom & King, *supra*, at § 17:39, p. 17-23.) Reversal requires a clear showing of abuse of discretion. (*In re Marriage of Hopwood* (1989) 214 Cal.App.3d 1604, 1607 [263 Cal.Rptr. 401]; *In re Marriage of Aninger* (1990) 220 Cal.App.3d 230 [269 Cal.Rptr. 388].) ■ A motion for modification of spousal support may only be granted if there has been a material change of circumstances since the last order. (*In re Marriage of Kuppinger* (1975) 48 Cal.App.3d 628 [120 Cal.Rptr. 654].) Otherwise, dissolution cases would have no finality and unhappy former spouses could bring repeated actions for modification with no burden of showing a justification to change the order. Litigants " 'are entitled to attempt, with some degree of certainty, to reorder their finances and life style [*sic*] in reliance upon the finality of the decree.' " (*In re Marriage of Farrell* (1985) 171 Cal.App.3d 695, 703 [217 Cal.Rptr. 397], citing *In re Marriage of Mulhern* (1973) 29 Cal.App.3d 988, 992 [106 Cal.Rptr. 78].) Absent a change of circumstances, a motion for modification is nothing more than an impermissible collateral attack on a prior final order. (*Ibid.*)

Some members of the bench and bar have been critical of the Legislature, contending it has failed to specify the purpose of spousal support. This criticism is unjustified and demonstrates a lack of understanding about why the Legislature and appellate decisions have vested trial courts with such broad discretion to decide this issue, whether at trial or upon a later request for modification or termination. The purposes of spousal support inevitably vary from case to case, depending upon the parties and the facts and circumstances of the case. The facts and the equities in one case may call for no spousal support, or for very short-term support for the purpose of financially assisting one spouse in the transition to single status or until the

proceeds from an ordered property division or sale can be received. (See *In re Marriage of Hebbring* (1989) 207 Cal.App.3d 1260 [255 Cal.Rptr. 488].) At the other end of the spectrum are cases where the purpose of spousal support is to provide financial assistance to the supported spouse until the death of one of the spouses because, as is the case here, the supported spouse is not able to generate income from employment or assets, or, in any event, an amount of income sufficient to provide for his or her own reasonable living expenses. (See *In re Marriage of Morrison* (1978) 20 Cal.3d 437 [143 Cal.Rptr. 139, 573 P.2d 41]; *In re Marriage of Brantner* (1977) 67 Cal.App.3d 416 [136 Cal.Rptr. 635].) In between are the myriad of factual circumstances which the trial court must consider in making its order for purposes which vary from case to case. For example, it may be appropriate to order support for a specific period of time for the purpose of enabling the supported spouse to obtain or complete an education (§ 4801, subd. (a)(1)(A)), to refrain from employment in order to remain home to care for young children until they reach an age at which a return to employment would be appropriate (§ 4801, subd. (a)(7)), or to become self-supporting within a reasonable time. (*In re Marriage of Berland* (1989) 215 Cal.App.3d 1257 [264 Cal.Rptr. 210]; *In re Marriage of Richmond* (1980) 105 Cal.App.3d 352 [164 Cal.Rptr. 381].) The examples are virtually as endless as the number of cases in which this issue is tried.

In other words, the purpose of spousal support cannot be defined by the Legislature; it is a determination to be made by the trial court in each case before it, based upon the facts and equities of that case, weighing each of the circumstances or guidelines specified by the Legislature in section 4801, subdivision (a), which are applicable to that case, as well as those specified by appropriate appellate case law. In making its order on the issue of spousal support, it is essential that the trial court possess broad discretion in order to fairly exercise the weighing process contemplated by section 4801, subdivsion (a), with the goal of accomplishing substantial justice for the parties in the case before the court. The issue of spousal support, including its purpose, is one which is truly personal to the parties.

Equitable considerations are the most significant factor in these cases. The Legislature and the appellate courts specify guidelines which must be considered by trial courts in deciding spousal support issues, but in the final analysis trial courts must possess broad discretion to decide the applicability and weight of these guidelines as they apply to the facts and equities of each case. "Although patterns in marital breakups emerge, each couple has such a diverse mix of circumstances that trial courts must have broad discretion in weighing and balancing the various factors in each particular marriage before making a suitable support award." (*In re Marriage of Smith & Ostler, supra,* 223 Cal.App.3d at p. 50.) After all, the primary direction

from the Legislature in section 4801, subdivision (a), is that "the court may order a party to pay for the support of the other party any amount, and for any period of time, as the court may deem just and reasonable," and, "Any order for support may be modified or revoked as the court may deem necessary." Weighing the factors specified in section 4801, subdivision (a), and by appellate case law, the trial court, in exercising its discretion on the issue of spousal support, must endeavor to make an order which will achieve a "just and reasonable" result in each case.

B. *The Appeal.*

1. *The Applicable Guidelines for Modification of Pat's Spousal Support.*

This case presents an unusual twist to a common byproduct of marital dissolution. ■ Separation is usually accompanied by a decrease in the standard of living enjoyed by both spouses, due to the additional expenses incurred by the party who leaves the family home. (See *In re Marriage of Burlini* (1983) 143 Cal.App.3d 65, 69 [191 Cal.Rptr. 541].) Under normal circumstances, if spousal support is still continuing, and if there is subsequently an increase in the supporting spouse's income sufficient to return both parties to the marital standard of living, support will be increased to an amount that will permit the supported spouse to live at that standard. (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351 [236 Cal.Rptr. 543].)

■ In the present case, however, the trial court found, and Pat concedes, that Bill worked excessive hours during the marriage and the parties established a standard of living that was beyond their means. Pat contends it makes no difference whether the established marital standard of living was unreasonable; she is entitled as a matter of law to an upward modification of spousal support to enable her to live at that precise standard based upon Bill's present financial circumstances.

■ Our analysis begins with the general rule that for a court to consider a motion for modification of spousal support there must first be a showing of a material change of circumstances since the last prior support order, taking into consideration both the needs of the supported spouse and the ability of the supporting spouse to meet those needs. (*In re Marriage of Kuppinger, supra,* 48 Cal.App.3d at p. 633.) A material change of circumstances may consist solely of an increase in the supporting spouse's ability to pay, but if that is the *only* change, then to obtain an increase in support there must also be a showing that the amount of support previously ordered

had not been adequate to meet the supported spouse's reasonable needs at that time. (*In re Marriage of Hopwood, supra,* 214 Cal.App.3d at pp. 1607-1608; *In re Marriage of Hoffmeister, supra,* 191 Cal.App.3d at pp. 363-364.) As Pat points out, this rule logically permits incremental increases through multiple modifications if there are gradual increases in the supporting spouse's ability to pay.[3]

In her brief, Pat succinctly contends, "The only sensible and equitable rule is as follows: there must be a material change in circumstances since the last order, before a court can increase support. Once that threshold is reached, the circumstances which existed at the time of that order are not controlling. The trial court must consider a myriad of other factors, in order to determine what level of support is appropriate under the circumstances which exist at the time of the current hearing. One important factor which it must consider is what the parties' standard of living was during their marriage." ■ However, Pat would also add the following principle to that rule: "If the supporting spouse has returned to the pre-dissolution standard of living, and can also afford to pay support at that level, that is the order which *must* be made." (Italics added.) We reject this use of only one factor in section 4801, subdivision (a), to the exclusion of all others.

Here, there was indisputably a material change of circumstances after the 1982 order, consisting of Bill's substantially increased income and the elimination of his substantial expense for his children's college education. The pivotal question is whether the standard of living actually established by Bill and Pat during marriage is the sole factor to consider in determining whether Pat's "reasonable" needs have or have not been met. Pat would have us so conclude. But that is not and never has been the law.

In 1987, at the time of the present modification, the general standard for assessing spousal support, set forth in section 4801, subdivision (a), was that the trial court could order payment of support in an amount "as the court may deem just and reasonable." (Former § 4801, subd. (a), as amended by Stats. 1986, ch. 1096, § 1, p. 3838.) The statute enumerated various circumstances to be considered in making the order, one of which was the "standard of living of the parties." (Former § 4801, subd. (a)(7), as amended by Stats. 1986, ch. 1096, § 1, p. 3838.) Judicial decisions have invariably characterized the supported spouse's "accustomed station in life" during marriage as *one* of the various factors to be considered in determining reason-

---

[3]Support may also be increased if there is a *dual* change of circumstances consisting of both an increase in the supporting spouse's ability to pay *and* an increase in the supported spouse's postseparation needs since the last prior support order, such as a change in health which precludes employment. (*In re Marriage of Hoffmeister, supra,* 191 Cal.App.3d at p. 364; see discussion, *post,* p. 495.)

able support. (E.g., *In re Marriage of Lopez* (1974) 38 Cal.App.3d 93, 115-116 [113 Cal.Rptr. 58]; *In re Marriage of Siegel* (1972) 26 Cal.App.3d 88, 92 [102 Cal.Rptr. 613]; *In re Marriage of Rosan* (1972) 24 Cal.App.3d 885, 897 [101 Cal.Rptr. 295].) The actual marital standard has never been viewed as the sole point of reference for determining a supported spouse's reasonable needs.

In 1988, after the hearing resulting in this appeal, the Legislature added a phrase to the general support standard prescribed by subdivision (a) of section 4801. The statute now authorizes support that is just and reasonable "based on the standard of living established during the marriage." (§ 4801, subd. (a).) The enumeration of the "standard of living" factor as among the various circumstances to be considered is changed to specify the "needs of each party based on the standard of living established during the marriage." (§ 4801, subd. (a)(4).) The trial court is required to "make specific factual findings with respect to the standard of living during the marriage," apparently sua sponte. (§ 4801, subd. (a).) We discuss the 1988 amendments for guidance in future cases and because both parties argue that these amendments, although not controlling here, bolster their respective positions on appeal.

■ Like the pre-1988 judicial decisions, and contrary to Pat's contention on appeal, the amended statute does not make the actual marital standard of living an absolute measure of reasonable need, but merely a "basis" or reference point for determining need and support. In effect, the amended statute incorporates the "prior case law consensus that the marital standard of living should be used as a *point of reference* in the court's weighing process." (Hogoboom & King, *supra*, at § 6:111, p. 6-105, italics in original.) The statute "does not, by requiring courts to consider the standard of living, set dollar boundaries on the amount of support but, again, simply furnishes a *point of reference* to be used in weighing all of the parties' circumstances." (*Id.*, at § 6.111.1, p. 6-105, italics in original.) True, the reference point is usually the *actual* marital standard of living, that is, actual expenditures during the marriage (*id.*, at § 6:113.2, p. 6-107), but all of the other applicable circumstances enumerated in section 4801 must also be considered.[4] As we shall discuss later, the real question is what the Legislature meant by marital "standard of living."

Although not binding on the issue of legislative intent, of considerable interest is a letter by the author of Senate Bill No. 1296. (*In re Marriage of*

---

[4]Pat contends the trial court erroneously used her 1981-1982 standard of living as the reference point. The court, however, merely compared the parties' financial circumstances in 1981-1982 and 1987-1988 to determine that there had been increases in Pat's actual needs and Bill's ability to pay support. (See discussion, *post*, pp. 496-497.) The court did not use Pat's 1981-1982 standard of living to determine her general level of reasonable need.

*Bouquet* (1976) 16 Cal.3d 583, 589-590 [128 Cal.Rptr. 427, 546 P.2d 1371].) This bill amended section 4801 in 1988, adding the requirement of a sua sponte factual finding as to the parties' marital standard of living and changing the factor of needs to "needs according to the marital standard of living." The bill resulted in the current language of section 4801. The author of that legislation, Senator Gary Hart, moved (and his motion was unanimously carried) that the following letter of intent be printed in the Senate Journal:

"This letter is to clarify the intent of SB 1296, Chapter 407, Statutes of 1988. SB 1296 establishes the marital standard of living as the starting point for spousal support determinations pursuant to Civil Code Section 4801. The marital standard of living is intended to provide a threshold or starting point from which courts are to begin consideration of the factors enumerated in Civil Code Sections 4801(a) (1)-(10). SB 1296 does not, and is not, intended to establish the marital standard of living as a mandatory 'floor' or 'ceiling' for a spousal support award. It does not eliminate judicial discretion to award spousal support in amounts greater or less than the marital standard of living based on the factors in Civil Code Sections 4801(a)(1)-(10)."

Thus the author of the most recent legislative change to section 4801, subdivision (a), states that the intent of the Legislature was not to eliminate judicial discretion to award spousal support in an amount greater or less than the marital standard of living based upon *all* of the factors in section 4801, subdivision (a).

Among the circumstances enumerated in section 4801 since its original enactment is the catchall category of "[a]ny other factors which [the trial court] deems just and equitable." (§ 4801, subd. (a)(10).) (See *In re Marriage of Smith & Ostler, supra*, 233 Cal.App.3d at pp. 48, 55.) This category encompasses the unusual twist in the present case, the fact that Bill worked excessive hours during the marriage and the parties lived beyond their means. As the trial court concluded, the actual marital standard of living was unreasonable for Bill and Pat. (*In re Marriage of Watt* (1989) 214 Cal.App.3d 340 [262 Cal.Rptr. 783].) ■■ For purposes of determining Pat's reasonable needs and what would be just and reasonable support, this factor counterbalances the actual marital standard in the weighing process. In other words, because the actual marital standard was beyond the parties' means, it has reduced significance as a point of reference in determining Pat's reasonable needs and support. Stated simply, Pat cannot reasonably demand support at the actual marital standard of living if that standard had

itself been unreasonably high under the circumstances.[5] Thus, given the peculiar facts presented here, what would have been a reasonable standard of living eclipses the actual marital standard, under subdivision (a)(10) of section 4801, as the ultimate measure of Pat's reasonable needs.

We reject Pat's contention that if Bill can afford it the law mandates that the trial court must make an order for spousal support in exactly the amount she claims she now needs to live in the marital lifestyle as she remembers it from 12 years before, and may not consider any of the other factors contained in section 4801, subdivision (a). Even Pat's trial attorney, in answer to a question from the trial judge during argument, acknowledged that the law requires the trial court to consider all of the section 4801, subdivision (a), factors in acting on a motion for modification. As previously discussed, case law and the statute itself require that the court consider the applicable circumstances of the parties and make an order that is just and reasonable.

The trial court concluded there was insufficient evidence to establish what would have been a reasonable standard of living for the parties in 1975 and hence what would be a comparable standard in 1987-1988. Pat does not dispute this conclusion. Indeed, she concedes that "[n]either side offered evidence of what would have been a 'reasonable' standard of living prior to separation." This is because Pat sought support at the actual marital standard, not at what would have been a reasonable marital standard. Undoubtedly, this approach was a sound trial tactic for purposes of seeking to obtain the greatest increase in support, but it now precludes any claim by Pat for a greater increase based on what would have been a reasonable marital standard. There is substantial evidence to support the trial court's finding that the modified support is sufficient to meet her reasonable needs, considering the guidelines of section 4801, subdivision (a).

As previously noted, Pat contends the trial court was required to award spousal support in the amount of $7,317 in order to produce after-tax income of $5,510, the amount she believes she now needs to maintain the marital standard of living of more than 12 years before. This is based on her claim that Bill now lives at that standard of living and can afford to pay this amount. She acknowledges that her expenses of $5,510 are "projected," not actual expenses. Indeed, she selected the figure of $5,510 because this is one-half of Bill's living expenses (which include his spousal support payment under the former order of $1,700), and she contends Bill testified that this

---

[5] Similarly, in an appropriate case the actual marital standard of living might have reduced significance as a point of reference if the parties lived at a standard substantially *below* their means, justifying support at a level above the actual marital standard. (See discussion, *post*, pp. 488-489.)

level of living expense allowed him and his present wife to live at the same standard of living which he enjoyed during his first marriage.

The trial court was not required to accept Pat's list of "projected" expenses. (Bill refers to it as her "1987 wish list.") First of all, this is bootstrapping, especially considering Pat's claims at oral argument which we will discuss shortly.

In making a motion for an upward modification of spousal support the moving party seeks more money because he or she contends that the present order, when made, was insufficient to meet his or her needs according to the marital standard of living, or that the reasonable cost of satisfying those needs has increased since the order was made. In either case, unless the supported spouse has gone deeply into debt by attempting to live at the marital standard of living without sufficient income to do so (and can therefore prove expenses actually incurred in excess of income), he or she will normally have to estimate or project what amounts he or she would likely have to spend in order to be able to live at the station in life achieved during the marriage. Thus it is Pat's needs which must be examined and proven, not Bill's standard of living due to post-separation separate property earnings. (*In re Marriage of Hoffmeister, supra*, 191 Cal.App.3d 351.) Secondly, Bill's testimony on this issue does not really support Pat's argument. When asked if his present living expenses enabled him to enjoy a standard of living about the same as he enjoyed before separating from Pat he replied, "Well, I'm not sure what that means."

The trial judge in this case is one of the most knowledgeable, experienced and competent family law judges in California.[6] Although he may not have agreed with Bill's characterization of Pat's testimony as "evidence of 1975 memories and 1987 wishes," he was not required to accept in full Pat's claimed "projected" expenses. This is especially true where they were based on Bill's expenses, not on her own needs. Under these circumstances, it was not unreasonable for the trial court to reject as speculative and unpersuasive Pat's claims as to the amount of money she projected she needed to achieve the standard of living she alleges she enjoyed 12 years before.

Pat argues, as her fallback position, that the increase to $3,300 is not even adequate to sustain her at a level comparable to what would have been a

---

[6] Judge Demetrios P. Agretelis, the judge who presided over this motion for modification, served with distinction as a full-time family law judge for the Alameda County Superior Court for over six years. Unfortunately, few judges remain in this important and sensitive assignment for that length of time. Judge Agretelis was one of the orginators of the innovative concept of direct calendaring for family law cases, i.e., assignment of cases to one judge for all purposes, a concept which is now also used by the Contra Costa and Los Angeles County Superior Courts. Thus, Judge Agretelis had extensive experience with the issue of "permanent" spousal support, both at settlement conferences and at trial.

reasonable marital standard, which she claims we can estimate based on a minimum yearly salary of $78,000, the amount Bill earned working fewer hours in 1977 and 1978. But it is too speculative to guess[7] at a likely reasonable marital income based on Bill's 1977 and 1978 income; the latter might have been favorably affected by postseparation factors such as an increase in Bill's hourly billing rate or the overall lucrativeness of his business. ■ ■ ■ ■ Also, even if we assume Bill would have earned a yearly gross marital income of $78,000 had he worked reasonable hours, there is no evidence of what would have been his *net* income after taxes,[8] knowledge of which is crucial to a determination of what would have been a reasonable marital standard of living.[9] In short, there is simply no evidentiary basis for anything but speculation as to what would have been a reasonable marital standard.

2. The Marital Standard of Living Factor.

The Legislature has never specified that spousal support must always meet the needs of the supported spouse as measured by the marital standard of living. Indeed, it would be unwise to do so. In most instances, it is impossible at separation for either party to have sufficient funds to continue to live in the same life-style enjoyed during the marriage. After separation

---

[7] Undoubtedly preceded by lengthy discovery, much of the four days of trial on Pat's modification motion was taken up with her testimony as to how the parties had lived 11 to 15 years before, e.g., how often they went to dinner and where. With such a passage of time anyone's memory is likely to be dimmed or distorted, recalling the good times and forgetting the bad. Indeed, in the final analysis much of such testimony is simply admissible opinion testimony by a lay witness, which the court may accept or reject in whole or in part, in order to achieve a fair result. If, as Pat contends, the rule were that she should receive, exactly to the dollar, what she now claims she needs to live in exactly the way the family of five lived many years before, the parties and the court would be faced with a near impossible task of assessing the standard of living 12 years before, given inflation, significant changes in tax laws, escalation of real property values and memories dimmed or distorted by time. Neither the parties nor overburdened trial courts can afford to devote trial and discovery proceedings to this elusive issue. A just and reasonable result can be more easily and less expensively achieved by presenting evidence of the general life-style the parties enjoyed during the marriage.

[8] For example, the Tax Reform Act of 1984 (Pub. Law 98-369) significantly reduced federal income tax rates.

[9] Pat also contends, alternatively, that her marital standard of living should not set an absolute ceiling for support because the postseparation increase in Bill's income is attributable to the "many industrious years" he invested in his work during the marriage, so that he is "actually reaping benefits which flow partly from his endeavors during the marriage." Again, there is no evidentiary support for this argument. Much of Bill's increase in income might have been attributable to factors other than the industry he brought to his job during the marriage, and the evidence does not permit us to speculate as to how much of the increase was not so attributable. The evidence is simply inadequate to justify a departure from the well-established rule with regard to postseparation separate property income that "the payor spouse should not be required to underwrite the other spouse for purposes of providing him or her a *better* lifestyle than established during the marriage . . . ." (Hogoboom & King, *supra*, at § 6:111, p. 6-105, italics in original.)

the parties have two households rather than one, and with California's high housing costs this represents a significant increase in living expenses. In addition, even if there were sufficient funds to allow both parties to live at the marital standard of living, such a rule would be inequitable under many circumstances. For example, under such an inflexible rule a spouse with substantial separate property income who reinvested most of it, using very little for living expenses during the marriage, could not, upon dissolution of the marriage, be required to pay a reasonable spousal support based upon his or her ability to pay. Additionally, if the parties lived at an artificially depressed marital standard of living because they lived on the salary of one in order for the other to go through a professional school, the working spouse, upon separation after attainment by the other spouse of a professional degree and the prospect of the high income which it would bring, would be unable to get any spousal support because of the marital standard of living of the parties. Such a result would be neither fair nor just. (See *In re Marriage of Watt, supra*, 214 Cal.App.3d 340.) Likewise, if the family income was high, but the parties lived at a depressed standard of living because one spouse was a compulsive gambler or a substance abuser, using substantial community income for this purpose, it would be unfair to require spousal support to be determined by the depressed marital standard of living if the obligor spouse had now recovered from his or her addiction and was enjoying an income which provided the ability to pay for a reasonable standard of living.

Bill has expressed confusion as to the meaning of the marital standard of living. In doing so, he joins distinguished company. California's family law bench and bar have also been unable to determine what the Legislature intended to be contained in "specific factual findings" on the marital standard of living, that is, what is to be the mode of measuring or describing that standard.[10] The Legislature has provided no guidance. Is this term limited to broad categories, such as lower income, middle income or upper income? Is it more narrowly defined so that a description of the marital standard of living as lower middle income would be appropriate? Is it intended to be even more specific, so that, for example, a finding of the gross annual family income before separation would be necessary? One highly respected family law authority has posed the question of whether the required factual finding of the marital standard of living would be satisfied by

---

[10] At the 1988 State Bar Convention, the Family Law Section of the State Bar presented a program on what the Legislature intended by the marital standard of living as reflected in the 1988 amendments to section 4801, subdivision (a), featuring a panel of a dozen distinguished certified family law specialists and family law judges. It is telling that after a two-hour panel discussion not one of these highly experienced family law experts could provide any guidance for what constitutes the required "specific factual finding with respect to the standard of living during the marriage."

the trial court's recitation of the zip code number within which the parties resided at separation.[11]

At oral argument, Pat contended that since Bill could afford it, she was entitled to the amount of spousal support that would enable her to live exactly as they had lived before separation. For example, she contends she is entitled to whatever support is necessary to enable her to live in the same house the family occupied at separation.[12] The fact that she may have had this lifestyle in Hawaii and had unilaterally given it up, according to Pat is irrelevant.[13] She contends she should be able to live wherever she wishes and be paid whatever amount of spousal support is necessary to allow her to live in exactly the same life circumstances she enjoyed during the marriage, as long as Bill's income is sufficient to pay the amount necessary to achieve this. In answer to our question whether this included a decision by her to move to a locale where costs for housing similar to what she enjoyed during the marriage might be extremely high, such as Park Avenue in New York City, she answered affirmatively, as long as Bill could afford it. This is not reasonable. We do not believe this is what the Legislature intended in its direction that needs according to the marital standard of living be considered by the court in setting spousal support. The marital standard is just one factor to be weighed with all other applicable factors to reach a "just and reasonable" result.

■■■ "The apparent legislative intent in mandating standard of living findings is to provide a record from which appellate courts can test 'abuse of trial court discretion' in failing to properly consider the standard of living support guidelines. . . . However, the statutory language ('*specific* factual findings *with respect* to the standard of living during the marriage') is unfortunately lacking in clarity as to exactly *what* the court's findings must cover and in *how much depth*. Must the findings track detailed marital income and expense records? What about *less tangible* lifestyle factors (e.g., the spouses' preference for living a 'city' or 'urban' life; or a marital pattern of

[11] The current provisions of section 4801 "impose a sua sponte duty on the court to make specific findings regarding the parties' marital standard of living, but the [statute] gives no guidance on how to measure or describe that standard. It will be interesting to see how trial judges handle this requirement. Will a recitation of the parties' zip code alone suffice? How about the square-footage of the marital abode, or the number of bathrooms, or the presence or absence of a satellite dish? Will terms such as 'upper-lower middle class' pass appellate muster? After all, in *In re Marriage of Andreen* (1978) 76 CA3d 667, 143 CR 94, 1978 CFLR 1046, the court held, as a matter of law, that a superior court judge is a member of the upper middle class." (1988 Cal.Fam.L.Rep. 3864.)

[12] The absurdity of this position becomes apparent by an example: if during a marriage two spouses and their seven children lived in a six-bedroom home, it would not be reasonable, upon a dissolution long after the children were grown and on their own, and the house sold, for the supported spouse to contend he or she was entitled to sufficient support to purchase a six-bedroom home in which he or she would live alone.

[13] See discussion, *post*, page 496.

living *below* or *above* their means)? This ambiguity arguably might overburden trial courts in an effort to 'overcomply' with the spirit of the statute for fear of risking reversal on appeal." (Hogoboom & King, *supra*, at § 6:144.1, pp. 6-125.11-6-125.12, italics in original.)

But what is meant by a marital standard of living? Without specific legislative guidance, we must make a determination for the family law bench and bar.[14] ▮ We believe that the Legislature intended the marital standard of living to be what case law has described it to be, that is, reasonable needs commensurate with the parties' general station in life. (*In re Marriage of Siegel, supra*, 26 Cal.App.3d at p. 92.) It is a general description, not intended to specifically spell out or narrowly define a mathematical standard. If the Legislature had intended something more specific, it could have prescribed a more specific measurement, such as the marital standard of living as measured by the gross annual family income. The Legislature has wisely chosen not to do so. As in this case, that figure is of little value to the judge hearing a motion for modification many years later. It appears to us that the Legislature intended "marital standard of living" to be a general description of the station in life the parties had achieved by the date of separation and this is satisfied by the everyday understanding of the term in its ordinary sense, i.e., upper, middle or lower income. Findings should be "specific" enough to be helpful in subsequent appellate or modification proceedings; the more specific the better. Trial courts, in cases where the parties are represented by counsel, are encouraged, with the assistance of counsel, to make more specific findings. In the very large number of cases in which parties represent themselves, especially where the judgment is obtained by a declaration rather than a court appearance, it is too much to expect lay parties to use anything other than the ordinary understanding of standard of living, and this will pass statutory muster.

▮ However, the finding as to what was the parties' marital standard of living is not the most critical issue upon a later motion for upward modification. What is more important is whether the trial court in initially ordering "permanent" spousal support, or upon prior modification, made a finding that the amount ordered was or was not sufficient to meet the reasonable needs of the supported spouse, considering the marital standard of living of the parties and the other factors contained in section 4801, subdivision (a). In the present case, for the first time, the trial court has made that finding by stating that "spousal support in the amount of $3,300 per month should be sufficient to satisfy [Pat's] reasonable needs."

In merely requiring a sua sponte finding of the marital standard of living, the Legislature has not provided much assistance to the parties or to judges

---

[14] Even authoritative family law experts have been left to speculate what was intended by the reference to standard of living during the marriage. (See fn. 10, *ante.*) In this opinion we seek to provide the guidance the Legislature did not give.

hearing later motions for modification. It is possible that an award of spousal support at trial could be found on appeal to be so overtly disproportionate to the finding of the marital standard of living, when considered within the totality of circumstances under section 4801, subdivision (a), as to require reversal for abuse of discretion. But it seems unlikely. If that is true, the primary reason for a finding as to marital standard of living is for use in later modification proceedings. At that time it is critical for the parties, counsel and the judge hearing the motion for modification to know whether the judge who issued the prior order found the support ordered was sufficient to meet the supported spouse's reasonable needs considering all applicable factors under section 4801, subdivision (a), including the marital standard of living.

Here, for example, the 1982 stipulated order contained no statement whether the support, as modified by stipulation at that time, was considered adequate to sustain Pat at the marital standard of living (reasonable or otherwise). Such a statement would certainly have aided the trial court in deciding the 1987 modification request, since a crucial issue in the 1987 inquiry, as is very often the case, was whether Pat's reasonable needs had been satisfied by the 1982 order. (See *In re Marriage of Hoffmeister, supra,* 191 Cal.App.3d at pp. 363-364.)

If the judge making the prior order has made an appropriate finding, as has now occurred here, or the parties in stipulating to spousal support also stipulate that the amount is sufficient to satisfy the supported spouse's reasonable needs, that finding or stipulation will be very helpful upon a later motion for modification. Under those circumstances, the moving party may not obtain an increase in spousal support solely by proving an increase in the obligor spouse's ability to pay, but would be required to prove an increased need. For example, the supported spouse may have suffered a disability precluding continued employment or, as here, may now be incurring increased expenses to maintain a reasonable standard of living consistent with section 4801, subdivision (a).

If the judge making the prior order finds, as would usually be the case, that, because the family now lives in two households or for any other reason, it is not possible to make a spousal support order which will provide sufficient funds for the supported spouse to live in a manner consistent with the marital standard of living, such a finding will be very helpful to the parties and a judge on a later motion for modification of spousal support. With such a finding, the only showing that would be necessary upon a later motion for modification is that the obligor spouse has an increased ability to pay spousal support considering all of the factors in 4801, subdivision (a).

For these reasons the Legislature may not have gone far enough in merely requiring a sua sponte finding of the parties' standard of living during the

marriage. Perhaps the Legislature should also have required a finding, when permanent spousal support is awarded, as to whether the amount of support awarded is sufficient to satisfy the reasonable needs of the supported spouse under all applicable circumstances of section 4801, subdivision (a).

Since the Legislature has not done this, we suggest that counsel consider asking for such a finding from the trial court. It would seem that counsel for a supported spouse who is not going to receive sufficient support to enjoy a standard of living consistent with that enjoyed during the marriage will want to ask for such a finding. On the other hand, counsel for the obligor spouse will want a finding that the amount ordered for support is sufficient to allow the supported spouse to enjoy a standard of living consistent with that enjoyed during the marriage. Since most spousal support orders result from stipulations, counsel may want to consider including a provision on this issue in marital settlement agreements.

3. Conclusion.

In summary, under the peculiar facts of this case, the parties' actual marital standard of living has reduced significance as a point of reference for determining Pat's reasonable needs and support, due to the fact that during the marriage Bill worked excessive hours and the parties lived beyond their means. A more appropriate measure of Pat's post-separation needs is what would have been a reasonable standard of living for the parties given what Bill would have earned had he worked at a reasonably human pace.[15] Because Pat did not present evidence that the amount of support, as modified, is insufficient to permit her to live at a standard comparable to what would have been a reasonable marital standard, she has not demonstrated an abuse of discretion justifying reversal.

Here a highly competent family law trial judge, knowledgeable about all of the applicable factors set forth in section 4801, subdivision (a), issued an order granting Pat's motion for an upward modification, almost doubling the amount of spousal support to be paid, and finding that the amount ordered is sufficient to satisfy her current reasonable needs. The test is not what order we would have made if one of us had been the trial judge. "Our role as an appellate court is not that of factfinder; that is the

---

[15] We do not mean to suggest that income from overtime work, or from a second job, should be disregarded in determining spousal support, either initially or upon modification. Such income must be considered by the trial court. However, how it is to be considered in a particular case is within the discretion of the trial court. In today's economy, it is not uncommon for a spouse to work overtime or at a second job in order for the family to survive. Upon the breakup of the marriage, the trial court, in its discretion, may find it necessary to make an order which gives the supported spouse a smaller percentage of the supporting spouse's overtime or second job pay than is ordered from the other's base pay, in order to provide the supporting spouse with the incentive to continue to work more than the law would require.

role of the trial court." (*In re Marriage of Prietsch & Calhoun, supra*, 190 Cal.App.3d at p. 656.) The role of the appellate court is not to second-guess the trial judge. Reading a typed reporter's transcript does not enable us to view the witnesses, determine credibility or determine which conflicting evidence is to be given greater weight.

"We therefore heed 'the well admonished rule of appellate review which finds a presumption that the court performed its duties in a regular and correct manner absent a clear showing to the contrary. [Citation.] '[T]he fact that a more liberal award might have been supported is not a proper test. [Citation.]' " (*In re Marriage of Bukaty, supra*, 180 Cal.App.3d at p. 150, citation omitted.)

Determining the issue of spousal support, including its amount and duration, is one of the most difficult and challenging tasks a judge faces. Invariably parties seeking support ask for amounts which they honestly believe to be the minimum necessary for them to survive, and adverse parties propose amounts which they honestly believe to be the most they can pay and have sufficient funds left for them to survive. Our experience is that both parties often are right, and that is why this issue brings so many cases to trial. In exercising the discretion vested under section 4801, subdivision (a), to reach a fair and just result, the trial court considers the circumstances listed therein that are applicable to the case, according each its appropriate weight under the facts of the case, and issues what the judge believes to be the proper decision. It is usually a decision which satisfies neither party, and perhaps that is one measure of a fair decision.

The factual and equitable circumstances of each case are unique. Although the factors listed in section 4801, subdivision (a), are comprehensive, their application in the particular case before the court for trial or modification is rarely easy. Determining the weight to be given to each in a particular case, in order to achieve the statutory goal of an order for support in an amount and for a period of time "as the court may deem just and reasonable," is extraordinarily difficult. The myriad fact situations, the credibility and believability of the parties, an understanding of human nature, and a sense of what amounts are reasonable for various items of claimed expenses are all factors not set forth in the statute, but, in the exercise of discretion, they inevitably influence the decision ultimately made. Indeed, one of the most difficult aspects of the decision the court must make is how much weight should be given to one of the factors versus one or more of the others applicable to the case. ▬▬▬▬ All judges may not possess the wisdom of Solomon, but determining spousal

support requires judges to exercise their discretion with all the wisdom they possess.[16]

### C. *The Cross-appeal.*

██ ██ ██ ██ On the cross-appeal, Bill contends the court erred in granting any increase in spousal support because there was no showing either that Pat's needs had been unmet by the 1982 stipulated order or that her needs have reasonably increased since then.[17]

██ Again, the applicable principles are as follows: If the only material change of circumstances since the last prior support order is an increase in the supporting spouse's ability to pay, support may be increased upon a showing that the amount of support previously ordered was not adequate to meet the supported spouse's reasonable needs at that time. (*In re Marriage of Hopwood, supra,* 214 Cal.App.3d at pp. 1607-1608; *In re Marriage of Hoffmeister, supra,* 191 Cal.App.3d at pp. 363-364.) Support may also be increased upon a showing of a *dual* change of circumstances since the last prior support order, consisting of (1) an increase in the supporting spouse's ability to pay, *and* (2) an increase in the supported spouse's post-separation needs (e.g., because of inflation) in order to maintain a standard of living comparable to the actual (or, as in this case, reasonable) marital standard of living. (*In re Marriage of Hoffmeister, supra,* 191 Cal.App.3d at p. 364.)

The court's statement of decision cited two reasons why there was a need for an increase. First, the court said the 1982 stipulated order "appears to acknowledge that $1,700 per month was not sufficient spousal support," since Pat had incurred additional debts which Bill had agreed to pay at the rate of $560 per month for 21 months. This amounted to a finding that Pat's reasonable needs had not been satisfied by the 1982 order. Second, there were "some adjustments that should be made to account for clothes, entertainment and medical care." This was a finding of increased needs since the 1982 order.

---

[16]Our discussion of spousal support makes clear why trial courts cannot simply use guidelines for temporary spousal support to make a "permanent" order for spousal support. The purpose of temporary spousal support is simply to maintain the status quo until the issue is tried or settled. The determination of "permanent" spousal support, in contrast, involves an exercise of discretion by the court, weighing the applicable factors in section 4801, subdivision (a). (*In re Marriage of Burlini, supra,* 143 Cal.App.3d 65; *In re Marriage of McNaughton* (1983) 145 Cal.App.3d 845 [194 Cal.Rptr. 176].)

[17]As to the 1982 stipulation to modify spousal support, the law presumes "that the parties arrived at a fair support award, after arm's-length negotiations, that took into consideration all of the circumstances as they then existed. The court thereafter should not permit a party to change this contractual arrangement, absent changed circumstances, as it would allow a party to repudiate and change a legal contract for no reason at all." (*In re Marriage of Hentz* (1976) 57 Cal.App.3d 899, 901 [129 Cal.Rptr. 678].) Of course, here the court found changes in circumstances since the 1982 stipulation.

 The court's first reason—its interpretation of the 1982 stipulated order—is debatable. Although the 1982 order required additional payments of $560 for 21 months, this was for *preexisting* charge account debts. The order also provided that Pat was solely responsible for any subsequent charges on those accounts. Thus, the order is equally susceptible to the inference the parties believed that once the preexisting debts were paid, there would be no further need for monthly support payments in excess of $1,700. But absent any significant evidentiary record from 1982 or explanatory recitations in the stipulated order as to the amount satisfying Pat's reasonable needs, the trial court could conclude that $1,700 per month would not be adequate to meet Pat's reasonable needs after payment of the preexisting debts, probably recognizing that Bill, at that time, was expending substantial sums for the college educations of the parties' adult children.

In any event, the court's finding of increased needs since the 1982 order is clearly supported by the record. A comparison of the income and expense declarations filed by Pat in 1982 and in November 1987 reveals significant increases in each of the three categories cited by the trial court.

First, monthly clothing expenses were asserted to be $100 in 1982 and were estimated at $1,000 in 1987, an increase of $900. Obviously the $1,000 figure is quite high, but it is comparable to Pat's dollar-equivalent but preinflation clothing expenses in 1975. The trial court could properly have found the increase, or some of it, was reasonable based on Pat's testimony that she was still wearing the same clothes she had bought during the marriage, had worn those clothes in 1982, and now had to replace most of her clothing.

Second, monthly entertainment expenses were estimated at $150 in 1982, with no estimated vacation expenses. In 1987, Pat's entertainment and vacation expenses were projected to be $500, an increase of $350.

Third, Pat had no medical and dental expenses in 1982 other than her monthly payments of $45 for health insurance upon her move to California, but in 1987, after the loss of her health insurance, she projected monthly medical and dental expenses of $500, an increase of $455. Bill contends the loss of health insurance was attributable to Pat's move from Hawaii and was thus her own decision which should not affect his support responsibility. However, Pat testified she moved because she wanted to live closer to her children. It was purely a trial court function to determine the factual question of whether this was adequate justification for Pat's unilateral decision to move and for incurring increased expenses, and

the extent to which the burden for assisting Pat in sharing these increased expenses should fall on Bill.[18]

The total estimated monthly increase in these three categories was $1,705,[19] and was thus more than sufficient to demonstrate increased needs after the 1982 order and was substantial evidence to support the $1,600 increase in spousal support.[20] If the court's analysis of the 1982 stipulated order was flawed, any flaw is inconsequential. The statement of decision did not make the court's determinations of inadequacy of the 1982 order and increased needs after 1982 interdependent for purposes of justifying an increase in support. We must therefore assume the court would have ordered the increase even absent its analysis of the 1982 order, based on the projected increased expenses after 1982.

## IV. DISPOSITION

The order is affirmed. The parties shall bear their own appellate costs.

Low, P. J., concurred.

**HANING, J.**—I concur in the result.

A petition for a rehearing was denied December 19, 1990, and the opinion was modified to read as printed above.

---

[18] Bill contends that *all* of Pat's increased expenses since 1982 are a result of her unilateral decision to sell her Hawaii home, cancel her full health insurance protection and move back to the San Francisco Bay Area. It appears from the evidence that he is correct, but this is another area where the trial court has broad discretion. When, as the result of a unilateral decision by the supported spouse, additional expenses are incurred or the supported spouse fails to become fully self-supporting by the time a prior support order is set to expire, whether this need for more money should result in an additional burden upon the supporting spouse is a judgment call to be made by the trial court in the exercise of its broad discretion. (*In re Marriage of Berland, supra*, 215 Cal.App.3d 1257.)

[19] Bill also contends Pat's increase in monthly housing expense from $1,079 in 1982 to $1,930 in 1987 was attributable to her move and was thus her own fault. The trial court did not, however, cite the increase in housing expense as a reason for increasing spousal support.

[20] We assume, because neither party discusses it, that in increasing spousal support to $3,300 per month the court considered the tax consequences to each party as required by section 4801, subdivision (a)(9).