Filed 2/29/16  Marriage of Swanson CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

|  |  |
|---|---|
| In re Marriage of KIM and KATHY SWANSON. | |
| KIM SWANSON, <br><br> Respondent, <br><br> v. <br><br> KATHY SWANSON, <br><br> Appellant. | G050137 <br><br> (Super. Ct. No. 10D004509) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Clay M. Smith, Judge.  Reversed in part, affirmed in part.

George Cooper Rudolph; Law Offices of Richard M. Shack and Richard M. Shack for Appellant.

Alan Charles Dell'Ario; Langston Williams and Joanne Langston for Respondent.

Kathy Swanson appeals from a judgment on reserved issues of spousal support and child support. Kathy contends the court abused its discretion to the advantage of her ex-husband Kim Swanson in setting these awards. Kathy also claims the court erred by ordering a child support award inconsistent with the statement of decision, because the judge who entered judgment was not the same judge who heard the evidence and prepared the statement of decision. We reverse the judgment in part.

FACTS

The parties married in 1985. Kim, approximately 62 years old, is a medical doctor with his own private practice. Kathy, approximately 55 years old, was a nurse prior to her marriage to Kim; she stayed at home during the parties' nearly 25-year marriage to care for the parties' eight children.

Kim petitioned for dissolution of marriage in May 2010. In August 2010, the parties stipulated to a temporary spousal support award, whereby Kim would pay Kathy $5,000 per month. The court entered a judgment of dissolution as to status only in September 2010.

Two stipulated judgments as to reserved issues followed, resolving all division of property issues. The parties each received $1,292,826 in community property, including a $414,699 equalization payment from Kim to Kathy. Kim retained the family residence (which was half community property, half his separate property), valued at $2.222 million at the time of division. The family residence was encumbered by two secured loans on which more than $500,000 was owed at the time of property division.

In June 2012, the court entered judgment with regard to custody issues, awarding Kim primary physical custody of the couple's four minor children. Kathy had visitation every other weekend.

2

In April 2014, the court entered judgment on several (though apparently not all) remaining issues in the case. The court ordered Kim to pay Kathy $4,100 per month in spousal support. The court ordered Kathy to pay Kim $1,319 per month in child support. This April 2014 judgment and the support orders encompassed therein are the focus of this appeal.[1] We are not tasked with reviewing any of the property division or custody rulings previously made by the court. We reserve additional recitation of facts for the discussion section.

DISCUSSION

*Entry of Judgment by New Judge Different from Statement of Decision by Prior Judge*

The April 2014 judgment at issue was signed by Judge Clay M. Smith. But the trial on the support issues in December 2012 and subsequent hearings triggered by motion practice pertaining to the support issues were heard by (now retired) Judge Ronald P. Kreber.

"As a general rule, unless the decision of the trial court has been entered in the minutes and the judge who heard or tried the case is unavailable, the final judgment in any case tried without a jury 'must be rendered by the judge who tried the case; it would be a denial of due process for a new judge to render a decision without having heard all of the evidence.'" (*In re Marriage of Colombo* (1987) 197 Cal.App.3d 572, 581; see also Code Civ. Proc., § 635 ["In all cases where the decision of the court has been entered in its minutes, and when the judge who heard or tried the case is unavailable, the formal judgment or order conforming to the minutes may be signed by the presiding judge of the court or by a judge designated by the presiding judge"].)

---

[1] The court also ordered Kim to pay Kathy's counsel $21,000 to assist in Kathy's payment of attorney fees. This component of the judgment is not challenged on appeal.

3

Kathy contends the court had two options following the retirement of Judge Kreber: (1) announce a mistrial; or (2) enter judgment "in strict accordance with the Statement of Decision, since that represented Judge Kreber's final, effective decision as of the date of his unavailability." Kathy asserts the court erred by entering a judgment that differed from the statement of decision prepared by Judge Kreber.

Judge Kreber issued four documents in connection with child and spousal support issues. First, in a February 2013 "Memorandum of Intended Decision," the court extensively analyzed the issues. The court set spousal support for Kathy at $4,100 per month and indicated Kathy would pay child support at the "guideline" amount (but neglected to state that amount in the memorandum). The court attached an Xspouse[2] printout to the order. The printout is not easily interpreted by one unfamiliar with the form, but it appears the guideline amount was calculated to be $1,319 per month. A copy of the same Xspouse printout was attached to the eventual April 2014 judgment.

Second, in a November 2013 document, the court responded to various objections to the February 2013 memorandum and indicated that the "tentative decision now becomes the final statement of decision."

Third, in a January 2014 document, the court attached a "Statement of Decision" prepared by Kim and indicated it was "the final draft of the statement of decision." The court explicitly vacated the February and November 2013 "intended" statements of decision. This January 2014 document maintained spousal support for Kathy at $4,100 per month, but eliminated the requirement that Kathy pay child support to Kim. Even though the court cancelled child support, the January 2014 document attached a copy of the same Xspouse printout. In this copy of the printout, however, the court interlineated a change to Kim's self-employed income ($26,075) to conform to the amount of income actually found by the court ($26,705). It appears this inconsistency

_____

[2] Xspouse is a software program certified by the Judicial Council for use by California courts in calculating support awards.

was simply a case of transposed numbers, as the court had consistently found Kim's "controllable cash flow" to be $26,705 from its February 2013 finding on the issue.  But, presumably because the court was no longer awarding child support (as of January 2014), it does not appear that the Xspouse calculation program was rerun to calculate the guideline support number based on the proper income input number.

Fourth, in a March 2014 document (a traditional minute order, listing a series of orders and lacking substantive analysis), the court stated it "follows the guideline child support order made in court's intended statement of decision."  The court did not identify an actual dollar figure of guideline support.

This March 2014 order was in response to Kim's motion for new trial. Counsel for Kim argued at the hearing "that the court made findings on child support, that it then determined at a later time to deviate from the guideline for reasons that are not permitted under the statute, and we're asking that guideline support be the order of the court."  The court agreed to go back to the "Xspouse in its intended decision."  The court acknowledged its ambivalence about this question, but concluded the law obligated a child support award:  "[I]n chambers I believe I indicated that wife's support is not sufficient in the court's mind, but that is not before the court today.  But it certainly came up in my mind when I made the ruling on child support and then took it out.  And the court would follow the guideline support for child support that I originally had in the intended decision."  The most reasonable interpretation of the record is that the court did not grant a new trial, but instead modified its statement of decision to reinstitute the child support award and the original child support analysis.  (See Code Civ. Proc., § 662 [in ruling on new trial motion following bench trial, "court may . . . change or add to the statement of decision"]; *Oliver v. Boxley* (1960) 181 Cal.App.2d 471, 477 [unnecessary

for court to grant a new trial to change its findings at a bench trial, Code Civ. Proc., § 662 was enacted "for the purpose of eliminating just such technicalities"].)[3]

In sum, Judge Kreber went back and forth several times on the question of child support. He originally decided Kathy should pay Kim guideline support, attaching a report calculating the support amount as $1,319 per month. He then changed his mind and eliminated child support payments, noting at the time that an input into the calculation of $1,319 per month was incorrect. In his final order in the case, Judge Kreber stated the court would follow the guideline child support requirement. Hence, by all indications, the judgment signed by Judge Smith attempted to implement the last word of Judge Kreber on the issue of child support. Kathy's factual premise — that Judge Smith entered judgment in a manner wholly inconsistent with Judge Kreber's statement of decision — is wrong. The judgment is almost entirely consistent with Judge Kreber's orders (i.e., the spousal support award, the attorney fee award, and the fact that Kathy was required to pay Kim the guideline support amount).

There is one important inconsistency, however. Guideline support was not actually $1,319 per month. The calculation made by Xspouse relied on the wrong amount for Kim's monthly income ($26,075). The court should have recalculated the guideline support using the court's finding that Kim's income was $26,705. Thus, the

---

[3] In her reply brief, Kathy criticized the lack of clarity in the minute order. It is certainly true that the minute order includes several misstatements and misclassifications concerning the nature of the motion at issue (i.e., referring to an "OSC" rather than a motion for a new trial and referencing a "CONTINUANCE" in its title). And it would have been preferable if the order had explicitly calculated and stated the amount of child support owed (rather than stating "The Court follows the guideline support order made in court's intended statement of decision"). But we ultimately conclude these imperfections do not require a new trial. The court's intent was clear.

Relatedly, Kathy is incorrect that the court actually granted the motion for new trial by amending its statement of decision under Code of Civil Procedure section 662. Thus, contrary to Kathy's position, the court was not obligated to "state the ground or grounds relied upon by the court" in granting a motion for new trial under Code of Civil Procedure section 657.

6

judgment must be reversed and remanded with directions to calculate the actual guideline amount of child support. Presumably, $1,319 is too much.

*Spousal Support Award*

Next, Kathy posits the court erred in awarding her only $4,100 per month in permanent (i.e., until a modification order or the death of a party) spousal support, despite her long term marriage to Kim (during which she cared for the couple's children) and Kim's successful medical practice. Kim counters that the award was entirely appropriate, in light of his primary physical custody of the couple's four minor children and Kathy's ability (if not inclination) to generate her own income.

"[T]he court may order a party to pay for the support of the other party an amount, for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances as provided in Chapter 2 (commencing with Section 4320)." (Fam. Code, § 4330, subd. (a).)[4] Assuming a court has considered and weighed the requisite statutory factors, only a spousal support award exceeding the bounds of reason may be reversed for an abuse of discretion. (*In re Marriage of De Guigne* (2002) 97 Cal.App.4th 1353, 1366.)

There is no assertion here that the court ignored its obligation to consider the statutory factors; the court explicitly cited and discussed all applicable factors in its statement of decision. Instead, Kathy claims the court's spousal support award could only have been reached by ignoring and/or failing to weigh evidence pertaining to various factors. We discuss each of Kathy's specific contentions in turn.

---

[4] All subsequent statutory references are to the Family Code.

7

A.  Kim's Income

Kathy argues the court erred in its conclusion that Kim had "income" (the court actually characterized it as "controllable cash flow" due to Kim's self-employment) of $26,705 for purposes of support awards.  One factor to consider in setting spousal support is "[t]he ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living."  (§ 4320, subd. (c).)

Kim is a practicing physician with a specialty in cardiology.  Relying on testimony from Kim's expert, the court found the "monthly controllable cash flow" coming out of Kim's medical practice for the 12 months ending on July 31, 2012 was $29,065 per month.  Since filing for divorce in May 2010, Kim took out more than $800,000 on the preexisting equity line of credit to pay for the $414,000 equalization payment, as well as other pressing household and business expenses.  Kim had to pay interest on the line of credit.  Subtracting out the interest payment, the court deemed Kim's "monthly controllable cash flow" to be $26,705.

Kathy makes several assertions of error.  First, she claims the court erred by limiting its consideration of Kim's income to the previous 12 months.  Kim made substantially more money in previous years.  But the court correctly focused on Kim's prospective earnings rather than a historical average.  (*In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, 1080-1083.)  It is generally reasonable for a court to use a 12-month period to determine a party's income for support purposes.  (*Id*. at pp. 1083.)  Kim testified that, despite working the same amount in recent years that he did previously, his net income has dropped.  He attributed this decline to reduced Medicare and private insurance reimbursements, and the shift of patients to managed health care plans.  The 12-month time period used by the court was reasonable.

Second, Kathy asserts the court should have deemed conclusive the parties' January 2012 stipulated judgment in which it was agreed that Kim's "gross monthly

controllable cash flow [was] $37,500." But this stipulated judgment was made for the purposes of dividing the parties' community property (including the medical practice), and explicitly stated that issues of spousal support and child support would be reserved for trial. Nothing in the stipulated judgment suggests that Kim intended to bind himself to the $37,500 figure for purposes of prospective support awards. The court was tasked with determining Kim's income as a factual matter at the time of trial for the purpose of prospectively setting spousal support and child support. Kathy did not argue during the trial that the court was bound by this prior stipulation. Nor did Kathy object to the testimony of Kim's expert as irrelevant, given the stipulated figure she now deems to be binding. The court had discretion to reject a strict adherence to a stipulation signed a year earlier for other purposes.

Third, Kathy argues the court should have included as income $8,000 in rent received from leasing the family's former residence beginning in October 2012. Kim testified he was paying more in expenses on the property than he was receiving in rent. Moreover, Kim spent $30,000 to improve the home for purposes of renting it, and it still took nine months to lease it after Kathy moved out in December 2011. The court essentially found that it was too early to tell whether Kim would enjoy income from the rental of the home, given the expenses incurred to obtain the rent.[5] The court suggested

---

[5] Contrary to Kathy's implication, Kim did nothing wrong by not identifying the rent payments on his income and expense declaration; it was signed and filed in September 2012, before the first rent check was received. Nor (again, contrary to Kathy's brief) did the court "ignore" Kim's admission that he was now receiving rent. The court considered the rent received but rejected the notion that there was enough evidence presented at the time of trial that Kim was enjoying a net benefit from ownership of the property.

Nor did the court double count the payment of the home equity line of credit taken against the family residence. Kathy's brief identifies $6,275 in expenses per month, ignoring the line of credit interest payment (which the court had already deducted from Kim's available cash flow). But Kathy fails to credit the $30,000 spent to get the house in shape. Allocated over a full year of rent, that adds an additional $2,500 per month, bringing Kim's expenses over $8,000 per month. As the court suggested, if Kim

9

Kathy could reexamine the issue at a later point, but that the only evidence at the time of decision was that Kim did not enjoy income from the rental. The court did not abuse its discretion in this regard. Kathy is free to seek modification of spousal support based on new information pertaining to Kim's income.

B. The Marital Standard of Living and Kathy's Contributions Thereto

Next, Kathy asserts the court ignored and/or failed to weigh evidence pertaining to the marital standard of living and Kathy's contributions to that standard of living. (§ 4320, subds. (a) ["The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage"], (a)(2) ["The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties"], (b) ["The extent to which the supported party contributed to the attainment of . . . a career position"], (d) ["[t]he needs of each party based on the standard of living established during the marriage"].)

"The marital standard of living has been described as 'reasonable needs commensurate with the parties' general station in life.'" (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 207.) "'Marital standard of living' is merely a threshold or reference point against which all of the statutory factors may be weighed. [Citation.] It is neither a floor nor a ceiling for a spousal support award. [Citation.] The Legislature intended 'marital standard of living' to be a general description of the station in life that the parties had achieved by the date of separation." (*In re Marriage of Nelson* (2006) 139

---

successfully leased the property again after the first year, then perhaps some rental income could be identified for purposes of a support order if Kathy brought a support modification request.

Nor does anything in the statement of decision or other rulings suggest the court double counted the other expenses connected with the family residence (the first mortgage, property taxes, etc.).

Cal.App.4th 1546, 1560.) "In most instances, it is impossible at separation for either party to have sufficient funds to continue to live in the same life-style enjoyed during the marriage. After separation the parties have two households rather than one, and with California's high housing costs this represents a significant increase in living expenses." (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 488-489.)

The court noted that Kim was the sole provider for a household of nine people, with two adult children attending college and three minor children attending private schools as of the date of separation. By late 2012, Kim was incurring more than $3,000 in child care expenses, $3,000 in groceries, $2,500 in rent, and similarly substantial other expenses to pay for the basic expenses of raising a large number of minor children. In setting the marital standard of living baseline, the court took into account the extraordinary circumstance of raising an unusually large number of children, including a special needs child. Although Kathy emphasized the parties' lavish homes and vacations, the evidence suggests that such extravagance was largely a thing of the distant past given the growing number and expenses of the children.

The judgment set the marital standard of living at $15,700 per month ($188,400 a year), a comparatively low level given Kim's income. The most reasonable interpretation of this numerical assessment is that the court found the parties enjoyed a lifestyle of a typical couple earning $15,700 per month, rather than the higher amount of income actually earned, because of their eight children and the largesse expended upon the children (e.g., private schools, activities, etc.). This number was also supported by an examination by Kim's expert of the family's monthly expenditures around the time the petition for dissolution was filed. The court rejected a marital standard of living of $38,000, which was based on an examination by Kathy's expert of Kim's average pre-tax income over the four years before the petition for dissolution. The court did not abuse its discretion in setting the marital standard of living.

11

The court acknowledged that its support award would not allow Kathy to live at the marital standard of living.[6] But a court may "'fix spousal support at an amount greater than, equal to or less than what the supported spouse may require to maintain the marital standard of living, in order to achieve a just and reasonable result under the facts and circumstances of the case.'" (*In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1316.) "[T]he Legislature has not expressed any preference that the 'standard of living established during the marriage' be maintained for its own sake." (*In re Marriage of Ficke* (2013) 217 Cal.App.4th 10, 24.) The court was tasked with considering all of the relevant factors, including "[t]he goal that the supported party shall be self-supporting within a reasonable time." (§ 4320, subd. (l).) The court did not abuse its discretion by failing to award Kathy sufficient funds to maintain her marital standard of living.

The court also fully acknowledged and considered Kathy's contributions to the parties' long-term marriage and her disadvantage in the job market based on her marital contributions. The court found a "big impact" on Kathy's career because of her domestic duties during the marriage, which was one of "long duration" (almost 25 years). These factors undoubtedly justify an award of $4,100 per month in permanent spousal support.

At the same time, Kathy did not contribute to Kim's education because he was already a physician when they met. And Kathy's current "earning capacity is not impaired by domestic duties as all minor children are in the physical custody" of Kim. Kathy was in good health at the time of trial. Kathy had done little to seek steady, significantly remunerative employment since the parties' separation. (See *In re Marriage*

---

[6] The court's finding in this regard would be helpful to Kathy if she were to subsequently seek to modify spousal support based on proof that Kim's income is actually higher than expected. (*In re Marriage of Smith*, *supra*, 225 Cal.App.3d at p. 492.)

*of Rosan* (1972) 24 Cal.App.3d 885, 896 ["When evidence exists that the party to be supported has unreasonably delayed or refused to seek employment consistent with her or his ability . . . that factor may be taken into consideration by the trial court in fixing the amount of support"].)

Balancing all of these factors, the court imputed only $1,100 per month in employment income to Kathy, below the vocational projection of $1,733 to $2,500 (and well below the even higher salary she could have obtained if she updated her nursing credential). (See *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 308 ["court may consider earning capacity in determining spousal support"]; see § 4058, subd. (b) ["The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the child"].) It was reasonable for the court to (mildly) fault Kathy for not having taken serious steps to secure a job (other than sporadic part-time, temporary positions) or job retraining (whether in nursing or otherwise) more than two and one half years after the petition was filed, and six months after judgment was entered awarding primary physical custody of the minor children to Kim. Kathy acknowledged her duty under *In re Marriage of Gavron* (1988) 203 Cal.App.3d 705, 712, to make good faith efforts toward self-support.

In sum, Kathy has not demonstrated an abuse of discretion in the court's balancing of the marital standard of living factor with other factors, including Kathy's contribution to the marriage.

C. Investment Income Imputed to Kathy

The court is required to consider "the earning capacity of each party" (§ 4320, subd. (a)) and "[t]he . . . assets . . . of each party" (§ 4320, subd. (e)) in setting spousal support. Courts are entitled to impute investment income when a party fails to invest money in an income-producing asset. (See *In re Marriage of Ackerman*, *supra*,

13

146 Cal.App.4th at pp. 210-211; *In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361, 1373-1374.)

Kathy asserts the court erred by imputing $1,007 in passive income to her based on her receipt of the $414,000 equalization payment in January 2012. The court's finding was based on Kim's expert opining that Kathy could receive $1,007 per month by investing this money in 10 year AAA-rated corporate bonds. Kathy did not present evidence attacking this interest income assumption, or evidence attacking the prudence of making such an investment given her circumstances.

Kathy admits she received the $414,000 equalization payment from Kim, but testified that only $270,000 remained at the time of trial. Kathy was only receiving a minimal amount of interest on the remaining funds because she maintained them in an ordinary savings account.

Kathy blames Kim for her failure to invest this money more prudently. From June 2010 until the trial in December 2012, Kim had a temporary obligation to pay $5,000 in spousal support. He met this obligation fully until June 2012. Kim did not meet his full obligations from June 2012 to December 2012; the parties disagree as to how much of the $30,000 owed was actually paid during this time period. Kim attributes his failure in this regard to reduced income and increased expenses related to his care of the children during this time period. Kathy claims she needed to draw down the $414,000 to pay additional expenses, particularly in the six months between June 2012 and December 2012. Accepting Kathy's testimony as true, Kim did not pay her $28,000 that he owed. Meanwhile, Kathy claims she spent $144,000 of the $414,000. Thus, at best, Kim's alleged failure to meet obligations from June 2012 to December 2012 was only a partial explanation for Kathy's dissipation of the $414,000. Moreover, other evidence suggested Kim had paid too much for expenses that should have been shared during the years leading up to trial, including the children's medical expenses and the costs of the family residence when Kathy was occupying that residence.

14

According to her testimony, Kathy's payment of attorney costs and fees was another cause of spending down her equalization payment.  But nothing in the record specifies how much she spent on litigation costs.  It also appears from Kathy's income and expense declaration that a large contributing factor was her ongoing efforts to assist the parties' young adult children (with college and other living expenses).  Kathy admits to paying the college tuition for her children "just this last semester."  (See *In re Marriage of Serna* (2000) 85 Cal.App.4th 482, 484, 491-493 [improper for court to use spousal support to compensate for one spouse's decision to support adult children].)

We conclude that the court acted within its discretion.  The evidence supports the imputation amount.  It was reasonable for the court to treat Kathy as if she still had the full amount of $414,000.  Had the court done otherwise, it would essentially have allowed Kathy to prejudice Kim's position by her unilateral decisions on the use of the $414,000.  Kathy's main complaint appears to be that the court did not take into consideration the effect of the alleged arrearages in temporary spousal support.  But the court reserved judgment on whether an additional order would be made with regard to alleged arrears; both parties, not just Kathy, claimed they were owed money in arrears for various reasons.  Thus, to the extent Kathy is correct that she should be compensated for shortages in spousal support at the end of 2012, that claim can be dealt with in a future order.

*Child Support Award*

Finally, Kathy challenges the child support order (beyond the fact that the guideline amount was calculated improperly because of a faulty number used in the program for Kim's income).  "The court shall adhere to the statewide uniform guideline and may depart from the guideline only in the special circumstances set forth in this article."  (§ 4052; see § 4057, subd. (a) [guideline amount "is presumed to be the correct amount"].)  Section 4055 sets forth a mathematical formula by which courts set guideline

15

support.  Child support awards are reviewed for an abuse of discretion.  (*In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1572.)

Kathy's main challenge is to the court's decision to impute income (both employment income and investment income) to Kathy.  (See § 4058, subd. (b) ["The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children"].)  Because this imputed income was another input into the guideline calculation, the calculation itself was (and would continue to be on remand) allegedly invalid.  But as discussed above in the spousal support section, the court did not abuse its discretion by imputing employment and investment income to Kathy.

Kathy also claims the court incorrectly believed it was bound by the guideline amount of child support in this case.  (See §§ 4056, subd. (a)(2) [court shall set forth "[t]he reasons the amount of support ordered differs from the guideline formula amount"], 4057, subd. (b) [presumption that guideline support is correct amount is rebuttable "by admissible evidence showing that application of the formula would be unjust or inappropriate in the particular case . . . because one or more of the following factors is found to be applicable"].)  Kathy does not, however, identify an applicable statutory factor (§ 4057, subd. (b)(1)-(5)) that would support a departure from the guideline amount.  (See *M.S. v. O.S.* (2009) 176 Cal.App.4th 548, 553 [court may depart from guideline amount only based on special circumstances identified in statute].)  Our review suggests that these grounds for departure were not applicable to this case.  The court's January 2014 determination that "it would not make sense to impose child support on Kathy [to] pay Kim" was based on factors more suited to consideration in the context of spousal support.

DISPOSITION


The judgment is reversed and remanded with directions to recalculate the guideline amount of child support using the proper amount of Kim's income, $26,705, and to enter a new judgment reflecting the guideline support amount. Aspects of the judgment other than the precise amount of child support awarded ($1,319) are affirmed. In the interests of justice, the parties shall bear their own costs on appeal.



IKOLA, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.

17