[No. G025314. Fourth Dist., Div. Three. Dec. 12, 2000.]

In re the Marriage of RAUL JOHN and JOANELL SERNA.
RAUL JOHN SERNA, Appellant, v.
JOANELL SERNA, Respondent.

## COUNSEL

Gary S. Gorczyca for Appellant.

No appearance for Respondent.

## OPINION

**SILLS, P. J.—** The Family Code is clear that child support ends, at the latest, at age 19.[1] The only exception is in the case of an adult child who

---

[1]Family Code section 3900 sets up the basic duty ("Subject to this division, the father and mother of a minor child have an equal responsibility to support their child in the manner suitable to the child's circumstances."); Family Code section 3901, subdivision (a) then

is incapacitated from earning a living and is without sufficient means.[2] Accordingly, in *In re Marriage of Chandler* (1997) 60 Cal.App.4th 124 [70 Cal.Rptr.2d 109], this court held that a trial court did not have jurisdiction in a very high income case to order the establishment of a trust that allowed surplus child support to be saved for the minor child's college education. "[A]bsent special circumstances such as completing high school or incapacity," wrote Justice Rylaarsdam for the majority, "a court has no authority to order a parent to support an adult child." (*Id.* at p. 130.)[3]

However, two Court of Appeal decisions, one from the early 1970's, *In re Marriage of Siegel* (1972) 26 Cal.App.3d 88 [102 Cal.Rptr. 613], and one from the mid-1980's, *In re Marriage of Paul* (1985) 173 Cal.App.3d 913, 918-921 [219 Cal.Rptr. 318, 63 A.L.R.4th 427], had previously circumvented the no-support-for-an-adult-child rule by allowing, as one consideration in a *spousal support* order, the fact that the supported spouse was supporting an able-bodied adult child. Later, *In re Marriage of McElwee* (1988) 197 Cal.App.3d 902 [243 Cal.Rptr. 179], made it clear that "indirect" able-bodied adult child support by means of increased spousal support was improper, but did not address the *Siegel* and *Paul* cases.

The instant case, like *McElwee*, also involves an attempt to indirectly obtain child support for two adult children via a spousal support order. We take the opportunity, not taken by the *McElwee* court, to explain why *Siegel* and *Paul* should not be followed.

## FACTS

When the parties were divorced in 1991, Raul John Serna worked for Unocal as an offshore worker making about $4,438 a month gross. After a

---

provides for its termination ("The duty of support imposed by Section 3900 continues as to an unmarried child who has attained the age of 18 years, is a full-time high school student, and who is not self-supporting, until the time the child completes the 12th grade or attains the age of 19 years, whichever occurs first.").

All statutory references in this opinion are to the Family Code.

[2]Section 3910, subdivision (a) provides: "The father and mother have an equal responsibility to maintain, to the extent of their ability, a child of whatever age who is incapacitated from earning a living and without sufficient means."

[3]The author of the present opinion dissented in *Chandler*, largely because of the anomalousness of allocating very high child support to a five-year-old's current lifestyle while utterly ignoring the child's need for a college education or savings to begin adult life. Even so, the implications of the majority opinion were perfectly clear: "After all, as the majority tell us, it is beyond the jurisdiction of a court to make even the slightest provision for a child's college education in a child support order, even in a case where a child has a very high income parent and the statutory guidelines yield a number grossly in excess of a child's current needs." (*In re Marriage of Chandler, supra*, 60 Cal.App.4th at p. 131 (dis. opn. of Sills, P. J.).)

26-year marriage to Joanell, he was ordered to pay $520 a month in spousal support.

Raul lost his job in 1996 when Unocal was bought out, but was able to continue making his spousal support payments from his severance pay. By 1997, at age 51, he found a job as a groundkeeper for a school district in Garden Grove making less than half of what he earned at Unocal—$2,118 a month—and brought a show cause proceeding to reduce his spousal support payments based on the change in his circumstances.

The trial judge reduced the support to $450 a month for fiscal year 1997-1998, and then stepped it down to $400 commencing July 1, 1998. Even so, Raul contended in a motion for reconsideration that it was still too much because in setting the new, lowered, levels of support, the trial judge specifically considered Joanell's support of two of the couple's four adult children: Kris, 25 years old and the mother of an infant boy, and Maria, a then 21-year-old college student.

Almost two years later, in March of 1999, Raul brought another show cause proceeding for a reduction in support, based on the fact that Kris, now a nursing student, had become employed at a local hospital, was getting married in a few weeks, and would be moving to Montana at the end of September. Maria had already moved out and was working as a waitress in Tahoe, albeit with a subsidy from Joanell of an undisclosed amount. (Joanell testified, "I often send Maria money.") Joanell's gross income was now $2,075 a month as a receptionist at a law firm, while Raul earned $2,521 a month, which included additional part-time work for the City of Brea two nights a week, plus a split shift on Saturdays (for a total of 16 extra hours a week). On her income and expense declaration Joanell listed Kris and Kris's now two young children as persons in her household whose expenses were included.

Nevertheless, the trial court (the same judge who heard the 1997 hearing) didn't change a thing. The court mentioned the fact that Raul, having remarried, had a "marital standard of living" that was "currently far and away superior from the standard of [Joanell]," the duration of the marriage, and that Raul was "able to handle additional part-time employment above and beyond which he has reported to the court by way of his income and expense declaration."

## DISCUSSION

We now reverse, and direct the trial court to hold a hearing that will result in a reduction of support retroactive to March 1999. The abuse of discretion is manifest.

*Extra Hours*

■ First, our Supreme Court made clear in *In re Marriage of Simpson* (1992) 4 Cal.4th 225 [14 Cal.Rptr.2d 411, 841 P.2d 931], that a supporting ex-spouse should not be penalized because he or she works "excess hours" or otherwise undertakes "an onerous work schedule." (*Id.* at p. 234; see also *In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 493 [274 Cal.Rptr. 911] [standard of living during marriage pegged to what supporting spouse would have made "had he worked at a reasonably human pace"].) In *Simpson*, the high court said: "We conclude that earning capacity generally should not be based upon an extraordinary work regimen, but instead upon an objectively reasonable work regimen as it would exist at the time the determination of support is made." (*In re Marriage of Simpson, supra,* 4 Cal.4th at pp. 234-235.)

The trial court's statement that Raul was "able to handle additional part-time employment above and beyond which he has reported to the court by way of his income and expense declaration" was without evidentiary foundation. The evidence was uncontroverted that the extra money that Raul earned by giving up two nights and Saturdays each week *was* included in his income and expense declaration. The marginal increase in his income from roughly $2,100 to $2,500 a month is the result of extra hours in addition to his regular full-time job.[4]

Raul is not, contrary to the trial court's intimation, required to work extraordinary hours so as to approximate the marital standard of living. Had the couple still been together when he lost his job, both he and his wife would have had to take the rough with the smooth and adjust their standard of living downwards. An ex-spouse's needs based on the standard of living during the marriage (§ 4320, subd. (d)) is only one of many equitable factors, and must necessarily be balanced against the economic realities of the job market. Raul is not a human paycheck which may be arbitrarily increased by expecting him, as the trial judge put it, to "handle additional part-time employment" without any regard to whether *he*, in modern parlance, "has a life."

---

[4]There is no evidence that Raul, either as an offshore oil worker or a school groundkeeper, was in an occupation where "a normal work week necessarily will require in excess of 40 hours or occasional overtime and thus perhaps an amount of time and effort which may be considered reasonable under the circumstances." (See *In re Marriage of Simpson, supra,* 4 Cal.4th at p. 236.) However, even if Joanell had presented evidence that Raul's $4,400 a month income as an offshore oil worker was the result of large amounts of overtime spent on an oil rig, the basic equities would make no difference. As the trial judge noted in the 1997 proceedings, Raul was doing the best he could to find a job as a school custodian; there was no hint of any *Philbin*-style attempt to avoid support by working below *reasonable* capacity. (After *Philbin v. Philbin* (1971) 19 Cal.App.3d 115 [96 Cal.Rptr. 408].)

*A Higher Standard of Living Because of Remarriage*

Second, given that Raul and Joanell earned roughly equal incomes but for Raul's extra hours (they were within $500 of each other despite Raul's overtime), any discrepancy in their current standard of living was the result of Raul's onerous work schedule, having remarried, or both. The Legislature has made it quite clear, however, that the income of a new spouse is not to be considered in any spousal support order. (Fam. Code, § 4323, subd. (b) ["The income of a supporting spouse's subsequent spouse or nonmarital partner shall not be considered when determining or modifying spousal support"].) To the degree that Raul was perceived to have a higher standard of living beyond what he earned by his extra hours, it is evident that the trial judge improperly took his new spouse's earnings into consideration.

*Indirect Adult Child Support*

 Finally, to some degree the latest order was still predicated on a consideration of Joanell's needs that included a subsidy for the couple's adult children, even though circumstances had changed (one child had moved out, one child was going to move out; both had jobs) lessening the need for that subsidy. Joanell included the expenses of that daughter and the daughter's two children in her own income and expense declaration, and in her statement to the court said that she "often" sends money to the daughter who had moved out and was living in Tahoe. There was no issue of incapacity.

Joanell's subsidies, either by way of the additional expenses incurred for the one child (and the two children of that child) still living at home, or directly for the child who had moved to Tahoe, should not have been considered. They were even more a form of indirect adult child support than the trust fund provisions that the *Chandler* court said were beyond the trial court's jurisdiction.

*In re Marriage of McElwee, supra,* 197 Cal.App.3d 902 also stands for the proposition that adult child support cannot be indirectly awarded under the guise of spousal support. In *McElwee,* a supported spouse challenged a finding of the trial court that the equity in her home was available for her support. She argued that she needed at least a three-bedroom residence so the couple's two adult children, ages 22 and 24, could visit her when on vacations. The appellate court rejected the assertion because it amounted to child support for adult children by other means: "Although [the supporting spouse] is paying their colleges expenses, he is under no current legal obligation to support them. Since he could not be ordered to make *direct*

*child* support payments to [the supported spouse], he cannot be ordered to do so *indirectly* by requiring him to make support payments to [her] sufficient to enable her to provide a residence for the adult children who would use it only intermittently." (*Id.* at pp. 910-911, italics added.)

*In re Marriage of Epstein* (1979) 24 Cal.3d 76 [154 Cal.Rptr. 413, 592 P.2d 1165] is sometimes cited for the idea that a court may consider the expenses of an *obligor* spouse in supporting an adult child in college for purposes of lowering support. (See Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2000) ¶ 6:708, p. 6-267.)[5] On closer inspection, however, *Epstein* does not endorse the idea of indirect adult child support.

In *Epstein*, the court simply noted that part of the supporting spouse's monthly expenses was $350 applied toward the couple's daughter's college education. (*In re Marriage of Epstein, supra,* 24 Cal.3d at p. 90.) The issue of whether the supported spouse was, in effect, being required to pay adult child support by means of *lowered* spousal support than would otherwise have been the case was *not* raised or discussed. (See *id.* at p. 90, fn. 13 [detailing the supported spouse's arguments that her ex-husband had an increased ability to pay based on several factors, none of which included the money spent on the daughter's college].)

To the same effect are *In re Marriage of Kelley* (1976) 64 Cal.App.3d 82 [134 Cal.Rptr. 259], and *Hall v. Hall* (1954) 42 Cal.2d 435 [267 P.2d 249],[6] both of which would later be cited, along with *Epstein,* by the court in *In re Marriage of Paul, supra,* 173 Cal.App.3d 913, 919, for the proposition that "[i]n practice, courts have expressly considered the fact that the supporting spouse is paying for the college education of an adult child when determining that spouse's ability to pay spousal support to the supported spouse." *Kelley* involved an appeal by an ex-wife from a step-down spousal support that terminated at the end of five years. The ex-husband had been awarded custody of the two daughters and had "anticipated additional expense flowing from the enrollment" of one of them in college. (*Kelley, supra,* 64 Cal.App.3d at pp. 88, 95.) Most of the opinion was taken up with whether the trial court erred in failing to provide for the retention of jurisdiction to continue spousal support after the five-year step-down period (*id.* at pp. 89-95); in the final two paragraphs the court briefly upheld the period

[5]*Epstein* is usually associated in the mind of family law practitioners with "*Epstein* credits" for reimbursement; the spousal support issue was one of several minor issues that the court dealt with along the way.

[6]*Hall's* comments on new trial motions would later be disapproved in *Carney v. Simmonds* (1957) 49 Cal.2d 84, 89-91 [315 P.2d 305].)

reductions because a reduction was indeed "justified" by the upcoming college expenses. No mention was made of any contention by the ex-wife that she was, in part, footing the bill for the support of an adult child in college.

In *Hall* the supported spouse could not have made such a contention in any event because there she specifically assented to her ex-husband's paying a certain amount per month for the couple's adult daughter's college education. (*Hall v. Hall, supra*, 42 Cal.2d at p. 441.) In reversing an award of alimony as not justified by the needs of the respective parties, the high court simply noted that the ex-husband (a federal district court judge with "probably . . . no net worth") had certain "fixed charges" (presumably including the college contribution) which left him a relatively small amount of money per month to live on. (*Id.* at p. 442.)

Unlike *Epstein*, *Kelley*, or *Hall*, where the issue of mandatory support for the college education of an adult child was simply never considered, *Jones v. Jones* (1986) 179 Cal.App.3d 1011 [225 Cal.Rptr. 95] met the issue head on. There, the college-age daughter of a divorced couple sued her father for a contribution toward her college education on the ground that her mother (who totally supported her) could not afford to pay for her proposed college education and her father could make the contribution without undue financial burden. (*Id.* at p. 1014.) The appellate court affirmed a judgment of dismissal after a demurrer was sustained without leave to amend because there was no basis on which to conclude that a parent had a "*legal* obligation to fund the college education of the adult child." (See *id.* at p. 1017, fn. 6 [distinguishing *Siegel* and *Paul* because they recognized the absence of any such legal obligation].)

### *Siegel and Paul Were Incorrectly Decided*

We now come to *In re Marriage of Siegel, supra,* 26 Cal.App.3d 88, and *In re Marriage of Paul, supra,* 173 Cal.App.3d 913, two cases that were somewhat less than strict in allowing a supported spouse's subsidy to adult children to be a consideration in spousal support. In *Siegel*, an ex-husband appealed from an order increasing his spousal support, in a case where his ex-wife was providing meals for the couple's divorced, drug-involved, unemployed adult daughter; the ex-wife had also taken in and was caring for the adult daughter's daughter. The couple also had two minor children still living with the ex-wife. The ex-husband claimed that part of the increase in his spousal support was "attributable" to the care being given the adult child and the granddaughter, "for whom he [was] not legally responsible." (*In re Marriage of Siegel, supra*, 26 Cal.App.3d at p. 91.)

The *Siegel* opinion began by expressing the court's exasperation with the husband's brief.[7] When the court finally addressed the merits of the ex-husband's argument, the court started with an extremely broad definition of the word "circumstances" (as in "the circumstances of the respective parties," as the phrase was used in old Civ. Code, § 139 which governed alimony). "Circumstances" was equated with " ' "practically everything which has a legitimate bearing upon the present and prospective matters relating to the lives of both parties." ' " (*In re Marriage of Siegel, supra,* 26 Cal.App.3d at p. 92, quoting *Hall v. Hall, supra,* 42 Cal.2d at p. 442.) The *Siegel* court then postulated that it was inevitable that the ex-wife would "deprive herself and the two minor children living with her in order to discharge a moral and social obligation to her daughter and granddaughter." (*Siegel, supra,* 26 Cal.App.3d at p. 93.) From that premise the *Siegel* court then waxed lachrymose: "The law, under the circumstances of the case at bench, should not require a mother and grandmother either to go without or cast her daughter and granddaughter into the street." (*Ibid.*) The panel supported its view of what the law "should not require" by then noting (and with perhaps a stereotyped view of sex roles) that the ex-wife's "[f]ulfilling her maternal obligation is a commendable part of her way of life just as much as entertaining her friends, contributing to worthy charitable causes or giving presents to her relatives on their birthdays, at Christmas or other memorable occasions." (*Ibid.*)

The closest the *Siegel* court came to addressing the contention that it was doing indirectly what the law would not permit directly was to dismiss the husband's argument as mere "[n]it-picking." (*Marriage of Siegel, supra,* 26 Cal.App.3d at p. 93 ["Nit-picking should not be a part of the court's obligation in determining what amount is just and reasonable under the circumstances for a former husband to pay his former wife as support, granted he has the ability to pay that amount"].)

*In re Marriage of Paul, supra,* 173 Cal.App.3d 913 involved a claim by an ex-wife that the trial court abused its discretion by failing to take into account her expenditures on "college tuition and related costs for her adult children as a factor in establishing her need for increased spousal support." (*Id.* at p. 916.) In agreeing with her contention, the *Paul* court began by noting that *Epstein, Kelley,* and *Hall* had each, "[i]n practice" allowed payor spouses reductions for funds committed to the couple's adult children's

---

[7]The husband committed such basic appellate errors as ignoring the inferences and presumptions that obtain on appeal. (See *In re Marriage of Siegel, supra,* 26 Cal.App.3d at pp. 90-91 [upbraiding appellant for making such mistakes as addressing himself "at length to the weight of the evidence"].) Things got worse for him when he misquoted the trial court's order, which again provoked the appellate court's ire. (See *id.* at pp. 91-92 [accusing appellant of "perversion" of trial court's statement].)

college education, and then reasoned that it would be "an anomaly" for the courts not to consider such expenses as a factor when it favored the payee spouse. (*In re Marriage of Paul, supra,* 173 Cal.App.3d at pp. 919-920 [" 'What's good for the goose is good for the gander' "].)

The *Paul* court next noted that the trial court had sympathized with the ex-wife, but had determined it had lacked authority to allow consideration of the contribution toward college. *Paul* solved that problem by relying on *Siegel.* The *Paul* decision finished up with a flourish on the importance of a college education, contrasting such a "morally commendable" purpose against "silly whims or fanciful pursuits." (*In re Marriage of Paul, supra,* 173 Cal.App.3d at pp. 920-921.)

The central flaw in both *Siegel* and *Paul* is that they allow for the naked circumvention of a decision that has already been made by the Legislature—namely, that child support ends at age 19 at the latest, absent incapacity to earn a living. Neither case ever quite confronted the idea that it was allowing something to be done indirectly what could not be done directly. *Siegel* rather conclusorily dismissed the point as "[n]it-picking" without even attempting to articulate any meaningful difference between adult child support and using it as a factor to increase a legal obligation to pay spousal support. It never dealt with the point that some money was still being required of a payor spouse to pay for what, under *Jones,* he or she clearly is otherwise *not obligated.*

As the *Jones* decision noted, efforts were underway in the Legislature in the mid-1980's to require divorced parents to pay for their adult children's college education. (See *Jones v. Jones, supra,* 179 Cal.App.3d at p. 1017.) The *Jones* court took such efforts as a legislative recognition that the law simply did not require parents to pay for their adult children's college education. *Siegel* and *Paul* were in effect making law by judicial fiat in an area where the Legislature had already spoken.[8]

In technical statutory terms, *Siegel* and *Paul* stretched the idea of "circumstances" to equate adult child support with charitable giving, and then folded the idea of charitable giving into the standard of living during the marriage. (Cf. § 4320, subd. (d); see *In re Marriage of Siegel, supra,* 26 Cal.App.3d at p. 93 [reference to "worthy charitable causes"]; *In re Marriage of Paul, supra,* 173 Cal.App.3d at p. 920 [relying on *Siegel*'s reference to worthy

[8]The Legislature occupies a better position than the judiciary to try to explain why a married couple who do not get divorced have no obligation to fund a college education for their adult children, but a divorced couple would have, in effect, a legal obligation to do so. After all, what legislator would want to run on a platform that would *require* every parent to pay for a college education for his or her children?

charitable causes].) But adult child support does not directly equate with the general eleemosynary activities of a married couple: The whole point about charitable giving is that it's *giving*.[9] Child support, on the other hand, is a fundamental duty and legal obligation, and its continuation beyond 19 (when the child is otherwise not incapacitated) implicates values distinct from those of "worthy charitable causes."[10]

As a result, *Paul*'s reliance on the *Epstein-Kelley-Hall* line of cases was unsound. Cases are not authority for propositions they never considered. (E.g., *People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 198 [96 Cal.Rptr.2d 463, 999 P.2d 686]; *People v. Gilbert* (1969) 1 Cal.3d 475, 482, fn. 7 [82 Cal.Rptr. 724, 462 P.2d 580].) Neither *Epstein* nor *Kelley* nor *Hall* ever considered the propriety of allowing a reduction in what a supporting spouse pays because that spouse has voluntarily undertaken a duty that the supported spouse has no obligation to fund.[11]

Ironically, though, *Paul*'s recognition of the "anomaly" of allowing supporting spouses to use contributions to an adult child to decrease spousal support without allowing supported spouses to do the same to increase it illustrates the unsoundness of allowing the consideration of adult child support into the factors bearing on spousal support. For example, case law has established that supporting spouses "cannot deliberately shirk support obligations by refusing to work." (See *In re Marriage of Reynolds* (1998) 63 Cal.App.4th 1373, 1379 [74 Cal.Rptr.2d 636], and cases discussed there.)[12] Suppose, for example, that a supporting spouse were to undertake the "morally commendable" task of helping the couple's adult child through a very expensive private college which left the spouse without much left to

---

[9]Both *Siegel* and *Paul* also made the error of assuming that it was "morally commendable" to make someone else pay for one's own private charity.

[10]Thus the question of charitable giving generally as a factor in determining spousal support is beyond this opinion. Suffice to say for the moment that there are nuances which are not before us. Contrast, for example, the case of a devoutly religious couple who send 10 percent of their gross earnings to a church, then split when the supporting spouse decides to leave their religion (let's say she goes with a religion that doesn't require tithing), with the case of very high income socialites for whom a regular donation to a local arts group (with the expectation that the donations precipitate invitations to usual gala whatevers and the opportunity to pose for pictures on the society page) is a part of their upscale "lifestyle."

[11]Strictly speaking, *Hall* should not be grouped with *Epstein* and *Kelley*. Where the supported spouse *agrees* that the supporting spouse should reduce his or her available income for support to help raise the couple's children the idea that the supported spouse is paying for adult child support by other means does not apply.

[12]The cases in the area tend to center on questions of retirement, or radical career changes. We do not comment further on the "*Philbin*" capacity issue in spousal support law (see fn. 4, *ante*) beyond what we have already said in light of *In re Marriage of Simpson, supra*, 4 Cal.4th 225.

pay spousal support? Most courts, one might hope, would easily recognize that the *supported* spouse was, in effect, subsidizing the supporting spouse's de facto adult child support to the degree that the expense was factored into the support decision.

## CONCLUSION

It was an abuse of discretion to deny Raul's modification request. We reverse the order denying Raul's modification request and remand the case to the trial court with instructions to modify spousal support in light of the changed circumstances unquestionably shown at that hearing.[13] The amount of the reduction is, of course, a matter for the trial court's discretion. Raul is to recover his costs on appeal.

Rylaarsdam, J., and Bedsworth, J., concurred.

---

[13]This means that any order will be retroactive to the date of the March 1999 hearing. We trust the trial court will be able to ameliorate any hardship to Joanell because of the retroactivity of the order through the use of credits for overpayments or other equitable devices.