Filed 4/22/21

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of DAVID MAHER and LAURIE STRAWN. | D076487 |
| DAVID MAHER, Appellant, v. LAURIE STRAWN, Respondent. | (Super. Ct. No. D562256) |

APPEAL from a judgment of the Superior Court of San Diego County, David B. Oberholtzer, Judge. Affirmed.

Law Office of Patrick L. McCrary and Patrick L. McCrary for Appellant.

Stephen Temko for Respondent.

_____

* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts B–D of the Discussion.

David Maher appeals from a judgment of dissolution of his marriage with Laurie Strawn. He primarily contends there is insufficient evidence to impute income to him and to step down the spousal support he is receiving.

In determining Laurie's ability to pay David support, the court took into account numerous circumstances, including that Laurie was spending about $3,000 per month for their adult son's college expenses. The interesting question this case poses is whether the court may properly consider that expense in determining her ability to pay spousal support. There is conflicting authority on the issue. (Compare *In re Marriage of Paul* (1985) 173 Cal.App.3d 913 (*Paul*) with *In re Marriage of Serna* (2000) 85 Cal.App.4th 482 (*Serna*).)

The trial court determined that the better reasoned cases—not the least of which is the Supreme Court's decision in *In re Marriage of Epstein* (1979) 24 Cal.3d 76 (*Epstein*)—indicate that the court has discretion to consider an adult child's college expenses like any other expenditure of discretionary income. The ultimate question in determining ability to pay is whether the expense is reasonable and will result in a just and equitable award of spousal support.

The main argument to the contrary is that supporting an adult child reduces the supporting spouse's available funds to pay spousal support. The supported spouse, so the argument goes, is in effect being compelled to pay adult child support, which the law prohibits. (*Serna, supra*, 85 Cal.App.4th at p. 488.)

We acknowledge, of course, that David cannot be *required* to support his adult child. Family Code[1] section 3901, subdivision (a) prohibits that. But the question here—whether Laurie's *choice* to spend her discretionary

---

[1] Undesignated statutory references are to the Family Code.

2

income on their adult child's educational expenses may be considered on equal footing with her other expenses—is distinctly different. As explained, both *Epstein* and section 4320 compel the conclusion that a trial court may appropriately consider a supporting spouse's payment of adult children's college expenses in determining ability to pay spousal support.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Parties*

After an 18-year marriage, David and Laurie separated in 2016. They have two children—a son who at the time of trial was 20 years old, and a daughter then age 18.

David, who is now 60 years old, has a Ph.D. in biochemistry and is also a lawyer. He was the primary earner during the early years of the marriage. From 1999 to 2008 he worked as a patent attorney, the last two years as a sole practitioner in Maher Law. In 2004 after he earned $215,000, the couple bought a $1.8 million home.[2]

About that same time, David began committing acts of domestic violence. Laurie logged the "major incidents" on her computer. She stopped keeping the diary in 2007 explaining, "He was hitting me so often I didn't have time to log events any longer."[3]

In 2006 David was earning over $100,000 per year; however, he stopped working in 2008 because of "health issues." Maher Law is "defunct" and owes back taxes.

---

[2]  In 2017, the parties sold the home for $2.2 million. Each received $350,000 from the sale and an additional $440,000 remains to be distributed.

[3]  In ordering spousal support, the court shall consider, among other circumstances, "Any history of violence against the supporting party by the supported party." (§ 4320, subd. (i)(3).)

David has sleep apnea, insomnia, post-traumatic stress disorder (PTSD), anxiety, and severe depression.  He testified that crowds, traffic, and noise make him nervous, afraid, and exacerbate his anxiety and PTSD.  He remains mostly alone in his apartment and has to "force" himself to socialize.

Yet on cross-examination, David admitted traveling to Las Vegas in 2018 where he attended an indoor rock concert.  He also attended "a few concerts" at the Del Mar fair with a "social group" and at the House of Blues.

David takes Valium "a couple times a day," along with anti-depressants, anti-anxiety drugs, and hydrocodone—an opioid.  He also drinks "three to four" glasses of wine nightly, although he denies having a "drinking problem."  David could not "recall" whether any physician told him to not mix alcohol with his medications.  He spends about $600 per month on wine— three times his child support obligation.  David testified that his PTSD and anxiety disorder prevent him from working.  And his sleep apnea and insomnia preclude him from working regular hours because he is "exhausted" and "unfocused."

Still, David has worked occasionally as a track and field coach, which he enjoys.  In 2018, for example, he earned about $1,000 as a high school track coach and was named "field coach of the year."  He is certified to coach through the college level.  In 2017 David obtained a substitute teaching certificate, but he never sought those jobs because he does not awaken until noon (due to his sleep disorder).  He is unwilling to work tutoring grade school or high school students, stating he has "patience issues."

Bernard A. Michlin, M.D. "looked briefly at some medical records" and spent 75 minutes interviewing and examining David.  Michlin did not independently diagnose David, nor did he contact any of his treating physicians.  Michlin opined that David has major depressive disorder, PTSD,

4

and anxiety that "can be extremely disabling" and which precludes him from "any meaningful" employment in his area of law and intellectual property. Michlin testified that David's alcohol consumption was not a concern because it would help him sleep.

Michlin believes David can do simple and repetitive work, like filing papers, scanning documents, and data input. He also believes David is capable of working as a part-time track and field coach. Michlin has "significant hope" that David's conditions will improve. He believes that working full time would ameliorate David's sleep disorder, anxiety, and depression.

Laurie holds a Ph.D. and since 2004 has been employed by a pharmaceutical company. She currently earns about $28,000 per month.

The parties separated in 2016. The triggering event was when David (who is six feet, three inches tall, and weighs about 300 pounds) punched Laurie in the face and slapped her during intercourse. Her nose bled "all over the bed." The next day, he assaulted their son (then 17 years old). Both David and the son sustained injuries in the ensuing fist fight. Laurie told responding police officers, "My nose still hurts, and I think it might be broken. Today he was worse than usual." Despite David's testimony at trial denying that he ever hit Laurie, in September 2016 the court issued a domestic violence restraining order against him.

Laurie supports the parties' adult son, who attends a state university. She pays about $35,000 per year for his tuition and living expenses. She also supports their daughter, who at the time of trial was graduating from high school and would be attending a private university where tuition and living expenses will be about $50,000 a year.

B.  *Dissolution Litigation*

In June 2016 Laurie filed for dissolution of marriage.  About a week later, David filed his own petition.[4]  In December 2016 the court imputed $1,733 per month to David, finding he "has the ability and opportunity to earn minimum wage."  The court also ordered Laurie to pay $4,376 per month in spousal support.  Effective January 2017, the court increased that to $6,218 per month.

After a five-day trial, in July 2019 the court issued a statement of decision.  It found David's testimony "not credible" and his retained medical expert, Dr. Michlin, to be "too much of an advocate."  The court noted that David's trips to Las Vegas and the county fair "belie his contention he cannot function in crowds or when overstimulated."  Conversely, the court found Laurie credible, noting "[s]he answered questions directly and without hesitating."

The court ordered Laurie to pay $4,000 per month in spousal support for one year (until May 1, 2020), reduced to $3,500 until May 1, 2021, and further reduced to $2,500 per month thereafter.  The step-down order reflected "the court's conclusion [that David] can become fully employed if he applies himself to overcoming his limitations."  The court issued a *Gavron* warning,[5] admonishing David that "he has an obligation to become self-supporting within a reasonable time."

The court imputed $1,000 per month of income to David, noting that his recent work as a high school track coach demonstrates "he can obtain

---

[4]     Apparently, the cases were consolidated under David's case number with him as the petitioner.

[5]     See *In re Marriage of Gavron* (1988) 203 Cal.App.3d 705, 712.

employment" requiring "intellect."  It observed that this was less than "one-half minimum wage" and that minimum wage jobs generally require "less skill and intellect than coaching and officiating track."

Although noting that Laurie has "an income to pay significant support," the court considered that she will be spending "substantial after-tax sums for [David's] children's education."  It further determined that "sending children to college is at least as much of the marital standard of living as the marital home, vacations, what cars they drive, how often they go out to eat, etc."  Citing section 4320, subdivision (n), the court concluded it had discretion to consider Laurie's payment of the adult children's college expenses when determining David's spousal support.[6]

## DISCUSSION

A. *In Determining the Amount of Spousal Support, the Court May Consider the Supporting Spouse's Payment of Reasonable Educational Expenses for Adult Children.*

" 'Permanent spousal support "is governed by the statutory scheme set forth in sections 4300 through 4360.  Section 4330 authorizes the trial court to order a party to pay spousal support in an amount, and for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances set forth in section 4320."  [Citations.]  The statutory factors include the supporting spouse's ability to pay; the needs of each spouse based on the marital standard of living; the obligations and assets of each spouse, including separate property; and any other factors pertinent to a just and equitable award. (§ 4320, subds. (c)–(e), (n).)' "  (*In re Marriage of Deluca* (2020) 45 Cal.App.5th 184, 195.)

---

[6]    Section 4320, subdivision (n) provides that in ordering spousal support, the court shall consider any factors it "determines are just and equitable."

" ' "In making its spousal support order, the trial court possesses broad discretion so as to fairly exercise the weighing process contemplated by section 4320, with the goal of accomplishing substantial justice for the parties in the case before it. 'The issue of spousal support, including its purpose, is one which is truly personal to the parties.' [Citation.] In awarding spousal support, the court must consider the mandatory guidelines of section 4320. Once the court does so, the ultimate decision as to amount and duration of spousal support rests within its broad discretion and will not be reversed on appeal absent an abuse of that discretion. [Citation.] 'Because trial courts have such broad discretion, appellate courts must act with cautious judicial restraint in reviewing these orders.' " ' [Citation.] An abuse of discretion occurs ' "when it can be said that no judge reasonably could have made the same order." ' " (*In re Marriage of Grimes & Mou* (2020) 45 Cal.App.5th 406, 424 (*Grimes & Mou*).)

The issue raised here is whether the court may consider payments the supporting spouse makes for an adult child's college expenses, in the same way that it considers other discretionary expenditures, in determining the appropriate amount of spousal support. There is authority on both sides of the question.

In the only Supreme Court case on point, the supporting spouse's monthly expenses included $350 for an adult child's college education. (*Epstein, supra*, 24 Cal.3d at pp. 81, 90.) Writing for a unanimous court, Justice Tobriner held the trial court did not abuse its discretion in considering that expense in setting spousal support. (*Id*. at p. 90.)

Several courts of appeal have reached similar conclusions. For example, in *In re Marriage of Kelley* (1976) 64 Cal.App.3d 82 (*Kelley*), the Second Appellate District, Division Four upheld an order reducing future

8

spousal support, stating the reduction was "justified by [the supporting spouse's] anticipated additional expense flowing from the enrollment of a daughter in college."[7] (*Id.* at p. 95.) Similarly, in *Marriage of Meegan* (1992) 11 Cal.App.4th 156 (*Meegan*), Division Three of the Fourth Appellate District affirmed a reduction of spousal support to *zero* where the supporting spouse entered a monastery where he would earn no income—despite his continuing $875 per month contribution (from savings) to their adult children's college education.[8]

Perhaps the most widely cited case of this genre is *Paul, supra,* 173 Cal.App.3d 913, which holds that a supported spouse's expenditures on college tuition and related costs may appropriately be considered as a factor in establishing need for increased spousal support. (*Id.* at p. 921.) Citing *Epstein, supra,* 24 Cal.3d 76, *Paul* noted, "In practice, courts have expressly considered the fact that the supporting spouse is paying for the college education of an adult child when determining that spouse's ability to pay spousal support to the supported spouse." (*Paul,* at p. 919.) Applying the predecessor to section 4320 (former Civil Code section 4801, subdivision (a)), *Paul* noted that circumstances affecting spousal support include " 'practically everything which has a legitimate bearing upon the present and prospective

---

[7] The child, born in 1957, was a minor at the time of trial in July 1975, but would be 18 within a few months thereafter. (*Kelley, supra,* 64 Cal.App.3d at p. 87.)

[8] Presiding Justice Sills, who authored *Serna,* concurred in *Meegan. Serna, supra,* 85 Cal.App.4th 482 does not discuss, or even mention *Meegan.*

9

matters relating to the lives of both parties.' " (*Paul*, at p. 919.)[9]  This may appropriately include "making legitimate educational expenditures" that "necessarily" impact support.  (*Id.* at p. 921.)

More recent cases, most notably *Serna*, *supra*, 85 Cal.App.4th 482, take a contrary approach.  For *Serna*, the starting point is that " 'a court has no authority to order a parent to support an adult child.' " (*Id.* at pp. 484, 491.) *Serna* reasons that if income that otherwise would be paid toward spousal support is instead spent on an adult child's college expenses, then the supported spouse is being compelled to indirectly pay adult child support:

> "The central flaw in . . . *Paul* is that [it] allow[s] for the naked circumvention of a decision that has already been made by the Legislature—namely, that child support ends at 19 at the latest, absent incapacity to earn a living. . . . [*Paul*] [n]ever quite confronted the idea that it was allowing something to be done indirectly what could not be done directly." (*Serna*, at p. 491.)[10]

---

[9]  In 1994, former Civil Code section 4801 was repealed and reenacted in Family Code section 4320.  (See *In re Marriage of Christie* (1994) 28 Cal.App.4th 849, 856–857.)

[10]  See also *In re Marriage of McElwee* (1988) 197 Cal.App.3d 902, 911 [Because husband is under no legal obligation to support the adult children, he cannot be ordered to do so indirectly by making support payments to wife sufficient for her to provide housing for them].  David states that *McElwee* was decided after *Paul* "by the same [d]istrict [c]ourt of [a]ppeal" and "therefore controls by implication."  However, *McElwee* and *Paul* were decided by different divisions of the Second Appellate District, so neither case controls the other.  (See *Jessen v. Mentor Corp.* (2008) 158 Cal.App.4th 1480, 1489, fn. 10 [" 'One district or division may refuse to follow a prior decision of a different district or division, for the same reasons that influence the federal Courts of Appeals of the various circuits to make independent decisions' "].)

We acknowledge, of course, that the trial court cannot require either parent to pay for an adult child's college education. But we disagree with *Serna*'s analysis because Laurie is not asking that David be required to support their adult children's education, nor does the court's order "bind David to subsidize . . . able-bodied, adult child's expenses" as he claims. Laurie asks only that in setting spousal support under section 4320, her choice to pay their children's college expenses be evaluated for reasonableness—in the same way the court would consider other expenses affecting her ability to pay support. If Laurie chooses to spend her discretionary income on their adult children's education rather than on Maui vacations,[11] luxury automobiles, and expensive clothes—that is her prerogative and a choice the court should respect and treat as it would any other legitimate expense. College expenses for adult children are among the circumstances to be considered in setting spousal support under subdivision (e) of section 4320 (each party's financial "obligations"), subdivision (k) (the "balance of the hardships to each party"), and subdivision (n) ("[a]ny other factors" that are "just and equitable").

In sum, we agree with the trial court that "sending children to college is at least as much of the marital standard of living as the marital home, vacations, what cars they drive, how often they go out to eat, etc." Moreover, a support order based in part on the supporting spouse's payment of reasonable college expenses for adult children is not "indirect adult child support" any more than considering vacation expenses or car payments would compel indirect support of the Four Seasons hotel chain or Ford Motor Company.

---

[11]    During the marriage, the couple spent $20,000 during a one-week Maui vacation at the Four Seasons.

In evaluating a supporting spouse's payment of adult children's college expenses under section 4320, the ultimate question is whether the amount is reasonable under the circumstances. In making that determination, the court should consider all relevant factors, including but not limited to: (1) whether the supported spouse, if still living with the child, would have contributed toward the educational costs; (2) the effect of the background, values and goals of the parents on the reasonableness of the child's expectation of higher education; (3) the amount expended; (4) the supporting spouse's ability to pay that cost; (5) the parents' respective financial resources; (6) the commitment to and aptitude of the child for the education; (7) the adult child's financial resources; (8) the child's ability to earn income during the school year or on vacation; (9) the availability of financial aid including reasonable amount of loans; and (10) the relationship of the education to the adult child's long-range career goals as affected by the family circumstances and values during the marriage.

We also depart from *Serna* because it reads *Epstein* too narrowly. *Serna* recognized that *Epstein* is "sometimes cited" for the "idea" that a court may consider a supporting spouse's payment of an adult child's college expenses "for purposes of lowering support." (*Serna, supra*, 85 Cal.App.4th at p. 488.) But *Serna* felt at liberty to hold otherwise on the grounds that *Epstein* did not actually consider whether the supported spouse was, in effect, being required to pay adult child support through lowered spousal support. (*Serna*, at p. 488.) According to *Serna*, "In *Epstein* the court simply noted that part of the supporting spouse's monthly expenses was $350 applied toward the couple's daughter's college education." (*Serna*, at p. 488.)

We read *Epstein* differently. The Supreme Court held that the trial court "did not abuse its discretion in limiting spousal support to $750 per

12

month" in light of the supporting spouse's total monthly expenses, which included $350 per month for the adult child's college. (*Epstein, supra*, 24 Cal.3d at p. 89.) Implicit in that holding is the trial court applied the correct legal standard. (See *KB Home v. Superior Court* (2003) 112 Cal.App.4th 1076, 1083 [in reviewing for abuse of discretion, the court "must determine at the outset whether the [trial] court applied the correct legal standard to the issue"].)

In any event, even if *Serna* correctly distinguished *Epstein*, we would reach the same result in this case. "[T]he fact that the State of California maintains so many institutions of higher learning at public expense" demonstrates the public policy of this state is that a college education "should be had, if possible, by all of its citizens." (*Hale v. Hale* (1942) 55 Cal.App.2d 879, 882–883.) Post-secondary education is indispensable for most highly paid jobs. And as most parents surely know, even at state supported colleges and universities, tuition, room and board is very expensive. Meanwhile, with 18 as the age of majority, it would be extremely rare for a child to complete college before becoming an "adult." Especially in families where parents emphasized the importance of post-high school education, expected that they would contribute financially to the children's higher education, and had the financial means to do so, it is both unrealistic and inequitable to preclude the trial court from considering parental contributions to post-high school educational expenses as a factor in determining the supporting spouse's ability to pay spousal support. Certainly there is nothing in the broad scope of section 4320 that would compel the court to treat these expenditures differently than it does any other discretionary expenses incurred by the supporting spouse.

13

B. *The Court Did Not Abuse Its Discretion in Imputing Income to David.*

The court imputed $1,000 per month income to David until May 1, 2020, and thereafter imputed $3,000 per month. On appeal, David challenges this ruling in two respects. First, he contends the court failed to make a finding that David has an opportunity to work. Second, he contends the evidence is insufficient to support such a finding because: (1) "[t]here was no evidence presented to show any opportunity for David to gain employment"; (2) Michlin's opinion that David was unable to work was "uncontroverted"; and (3) there was "no evidence of any vocational evaluation supporting present or future imputation of income at any level." David also complains that the court erred in imputing income beyond retirement age. As explained below, we reject each of these contentions.

1. *The Court's Finding that David Has Ability to Work is Supported by Substantial Evidence.*

The court may consider a party's earning capacity as a factor in determining spousal support. (§ 4320, subds. (a)(1), (g).) Earning capacity is comprised of ability and opportunity to work. (*In re Marriage of McHugh* (2014) 231 Cal.App.4th 1238, 1246.) " 'The "opportunity to work" exists when there is substantial evidence of a reasonable "likelihood that a party could, with reasonable effort, apply his or her education, skills and training to produce income." ' " (*Ibid*.)

Contrary to David's contention, the court made the requisite findings to impute income. The statement of decision recites, "The step-down [in spousal support] reflects the court's conclusion [David] can become fully employed if he applies himself to overcoming his limitations." Later, the statement of decision adds, "[David] has the capacity to earn."

This finding is supported by substantial evidence. At the time of trial David was coaching youth track. Additionally, in 2018 he worked as a high

14

school track coach and track official. In March 2018, David sent an e-mail to a public school inquiring about a coaching position. The medical evidence also supports a finding that David has the ability to work. Michlin testified that David is presently capable of working part time. And if David enjoyed his work (e.g., coaching), Michlin believes he would make changes in his life needed to work full time.[12]

Moreover, the trial court was entitled to, and did view with skepticism David's claimed inability to work. For example, David claimed that crowds and noise trigger his PTSD and crippling anxiety. But David flew from a presumably busy airport to Las Vegas, a town not known for monastic solitude. He attended an indoor concert there, and on other occasions frequented the county fair and attended a crowded nightclub—all with no ill effects.

2. *The Finding that David Has Opportunity to Work is Supported by Substantial Evidence.*

There is also substantial evidence that David has the opportunity to work. In 2017 David passed the test necessary to work as a substitute public school teacher. A vocational expert testified that an entry level teaching job pays about $58,000 per year. There is a strong demand for math and science teachers. David would be "highly competitive" for a teaching position because he has experience working with high school students and holds a Ph.D. in

---

[12]    David contends the court's determination that he "chooses" not to work was intended to "punish" and "disparage[]" him. This is untrue. In stating that David chose not to work, the court was referring to David's nightly alcohol intake and opioid use (which David concealed from Michlin). Laurie testified that David began "drinking heavily" in 2012 and his substance abuse worsened over time as he "started drinking and taking pills together." The court concluded that David "has the ability to address his emotional problems and substance abuse, [but] he prefers not to."

15

biochemistry. Although David would have to spend a year to obtain a teaching credential, in the interim he could work as a substitute teacher (earning about $125 per day), for which there is a current demand. Moreover, David also has other part-time opportunities to tutor students in math and science. These positions pay between $25 and $40 per hour.[13] In light of this evidence, we are at a loss to understand David's claim that "there was *no evidence* of any vocational evaluation supporting present or future imputation of income at any level." (Italics added.)

In asserting the evidence is insufficient to support these findings, David points to Michlin's report, which states he is incapable of performing "any kind of meaningful employment requiring use of his intellect and cognitive skills on a significant, long-term basis." Stating that Michlin's opinions were "uncontroverted," David contends the court "impermissibly substituted its medical opinion for that of the [uncontroverted] expert who testified without objection to David's current and foreseeable inability to be functionally employed."

David's argument here distorts the record. On cross-examination, Michlin substantially retreated from some of the opinions in his written report. For example, he testified (1) there was "significant hope" that David's conditions will improve; (2) a coaching job would be therapeutic; and (3) returning to full time work would be "very good for him." When confronted with David's alcohol consumption, Michlin ultimately conceded that drinking a bottle of wine each night worsens sleep disorders. He also

---

13      This evidence also refutes David's claim that there was "no evidence" from which the court could impute "any amount of income" other than that of a track coach.

opined that if David had "discipline" to go to bed on time, he could physically work full time.

Moreover, the trial court was not bound by Michlin's testimony. Generally, the trier of fact may reject even uncontradicted expert testimony, as long as it does not act arbitrarily. (*Forman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890.) Given Michlin's apparent bias (as David's retained expert) and the lack of any corroborating medical evidence (no other physician testified and no medical records were offered into evidence), the trial court could give Michlin's testimony whatever weight it deemed appropriate. Although Michlin entitled his report, "Independent Medical Examination"—even David concedes that as his retained expert "it would be expected that [Michlin] would advocate" for his position.

3. *The Court Did Not Abuse Its Discretion by Imputing Income Beyond Retirement Age.*

The age of 65 is the customary retirement age. (*In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 269.) Trial courts cannot impute earning capacity to an age-65 retiree based on his or her earnings when employed. (*Marriage of Reynolds* (1998) 63 Cal.App.4th 1373, 1378 (*Reynolds*).) David contends the court erred in imputing income without providing an end-date because in five years he will reach retirement age.

*Reynolds* does not support David's argument. There, a 66-year-old who recently retired sought a reduction in his spousal support obligation. The trial court only partially reduced support, effectively imputing income based on his ability to work. The appellate court reversed because the order would have required the retirement-aged spouse to continue working to pay the same level of spousal support as when he was employed. (*Reynolds*, *supra*, 63 Cal.App.4th at p. 1378.) In contrast here, David is about five years from retirement age. Upon reaching retirement age, David may move to modify

17

the order imputing income based on changed circumstances.  (*Id.* at p. 1379.)
We express no opinion on the disposition of any such motion.

      4. *The Court Did Not Abuse Its Discretion in Stepping Down David's*
         *Support Over Time.*

The court awarded David $4,000 per month in spousal support until
May 1, 2020.  One year later support decreases to $3,500.  Another year later,
to $2,500.  The court explained:

> "The step-down reflects the court's conclusion [David] can
> become fully employed if he applies himself to overcoming
> his limitations.  He has one year to make a little progress,
> one more year for moderate progress, and a third year for
> substantial progress."

David concedes that "a step-down spousal support order is certainly
within the court's discretion."  However, he contends that for the same
reasons the court abused its discretion in imputing income, there is also
insufficient evidence to support a finding that David would have a reduced
need for support.

A step-down order informs "each spouse that the supported spouse has
a specified period of time to become self-supporting, after which the
obligation of the supporting spouse will cease. . . .  However, if things do not
work out as contemplated, the supported spouse can, upon a showing of good
cause, request a change in the original order as to amount or as to the term
for jurisdiction over the issue of spousal support.  [The order] psychologically
prepares the supported spouse for the time when he or she must be self-
supporting.  It also places the burden of showing good cause for a change in
the order upon the one who is most able to exercise the control necessary to
meet the expectations the trial judge had in making the order." (*In re
Marriage of Prietsch & Calhoun* (1987) 190 Cal.App.3d 645, 665–666.)

18

" '[O]rders for changes in support to take effect in the future must be based upon reasonable inferences to be drawn from the evidence, not mere hopes or speculative expectations.' " (*In re Marriage of Smith* (1978) 79 Cal.App.3d 725, 740.) "The critical inquiry. . . is whether the step-down provision, standing alone, is supportable given the parties' circumstances at the time the order was made." (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 311.)

Substantial evidence supports the finding that David can realistically be self-supporting (or nearly so) when support diminishes. (See *In re Marriage of West* (2007) 152 Cal.App.4th 240, 248.) The vocational rehabilitation expert testified that in a six- to nine-month period David could reasonably be expected to complete substance abuse treatment concurrently with vocational planning. David could obtain a teaching credential within one year by attending month-to-month university classes with rapid start dates. Additionally, Michlin testified there were "incredible medications" that have "revolutionized the treatment of anxiety and depression." He explained, "I have taken people that are completely non-functioning, because of their anxiety, depression, and have made them productive individuals." Michlin recommended that David take medication that would reduce or eliminate his desire to consume alcohol. Michlin has "significant hope" that David's conditions will improve, stating, "I don't want him to think that this is his life for the rest of his life."

C. *The Court Did Not Abuse Its Discretion in Characterizing the Marital Standard of Living.*

1. *Additional Background*

In ordering spousal support a court must consider the "extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage . . . ." (§ 4320, subd. (a).) The marital

19

standard of living is a general description of the "station in life" the parties maintained at the date of separation; it is not a "mathematical standard." (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 491 (*Smith*).) "While 'the marital standard of living is an important factor in determining spousal support, it is not the only factor, and its importance in determining whether it is "just and reasonable" (§ 4330) to award spousal support will vary based on the court's evaluation of the section 4320 factors.' [Citation.] After considering the marital standard of living along with the other statutory factors, 'the court may "fix spousal support at an amount greater than, equal to or less than what the supported spouse may require to maintain the marital standard of living, in order to achieve a just and reasonable result under the facts and circumstances of the case." ' " (*Grimes & Mou, supra,* 45 Cal.App.5th at pp. 424–425.)

In this case, the evidence establishing the marital standard of living pulled in two very different directions. On the one hand, the couple lived in a $1.8 million, 4,500 square foot home, took expensive vacations, and spent about $8,000 per month on credit cards which they monthly paid in full. They amassed a 420 bottle wine collection. Together they drank two bottles of wine every night.

But beginning in 2005, the family home became in Laurie's words, a "hovel" and "squalid." They lived on bare cement floor after a flood ruined hardwood flooring and bedroom carpet. Laurie testified that "it really became bad once [David] started shopping obsessively online and just piling things up all over the house." According to Laurie, in addition to leaking toilets and no flooring, three of four showers were not functioning, the pool was a "swamp," and the home needed $70,000 in repairs to make it livable before it could be sold.

After separation, David moved to a 1,200 square foot apartment that he rents for $2,800 per month. The garbage disposal, microwave, shower, and refrigerator are inoperable. David has not asked the landlord to repair the appliances because he continues to live in squalor and is embarrassed to have anyone inside his apartment.

Laurie now lives in a substantially smaller home. Her mortgage, property tax, insurance, and related expenses are about $2,000 less per month than like expenses for the couple's marital home.

2. *The Court's Ruling*

The court's statement of decision specifically addressed the marital standard of living:

> "It is difficult to put a word to the parties' marital standard of living—appalling comes close. They lived in a filthy refuse strewn home with each evening dedicated to drinking a bottle of wine each. ([Laurie] testified [David] would not allow her to clean the house while he was home, and he seldom left.) The court rarely casts marital standard of living in terms of spendable income; it is particularly inappropriate here . . . ." [¶] . . . [¶]

> "The court is not confined to choosing upper, middle or lower, none of which describe the parties' living conditions. At [date of separation], [David] was living in a squalid house strewn with garbage, refuse, discarded items left to sit where they dropped and rooms filled with empty cardboard boxes from his online shopping . . . . He has maintained that same standard of living." [¶] . . . [¶]

> "None of [David's] evidence supported his claim he needed over $15,000/month to meet the marital standard of living. Given the condition of his apartment . . . and the condition of the parties' home at [date of separation], he is presently maintaining nearly the marital standard of living by living

21

in squalor, drinking a bottle of wine each day and eating fast food."[14]

3. *The Court Did Not Abuse Its Discretion in Considering the Marital Standard of Living.*

Citing *Smith, supra,* 225 Cal.App.3d 469, David contends the court erred by not describing the marital standard of living in financial terms: " 'upper, middle, or lower income.' " He also faults the court for not acknowledging that the marital home sold for almost $2.2 million. David argues that the court's characterization of their standard of living was "a moral condemnation of their living conditions, not an impartial evaluation of their 'general station in life' based on their financial conditions as of the date of separation."

*Smith* does not support David's contentions. First and foremost, the marital standard of living is just one of many circumstances courts consider in determining spousal support. (*Smith, supra,* 225 Cal.App.3d at p. 484.) Marital standard of living is a "general description" and not a "mathematical standard." (*Id.* at p. 491.) David is correct that in *Smith*, the court found "marital standard of living" may perhaps be best understood in its ordinary sense, i.e., upper, middle or lower income. (*Id.* at p. 491.) But that is not the exclusive manner of describing a couple's station in life. Rather, as *Smith* notes, "The factual and equitable circumstances of each case are unique." (*Id.* at p. 494) Indeed, with some prescience, *Smith* gave as an example: "family income was high, but the parties lived at a depressed standard of living because one spouse was a . . . substance abuser." (*Id.* at p. 489.) In the

_____

14 The court referred to certain photographic exhibits to support its description of the marital home and David's apartment. The parties have not transmitted those exhibits on appeal.

unique circumstances here, the trial court did not abuse its discretion in characterizing the marital standard of living.

D. *David has Waived Issues Involving Unpaid Maher Law Debts.*

For purchases made before the date of separation, Maher Law had incurred credit card debts: (1) Capital One: $6,552; (2) Bank of America: $12,929; (3) Bank of America (second credit card): $11,217; (4) American Express: $10,728; and (5) Citibank: $2,981.

These accounts were paid in full from $58,835 in loans against a community property brokerage account. At the time of trial, the outstanding loan balance was approximately $22,000.

The court ruled that Maher Law expenses David paid after the date of separation are community expenses and "[a]ny debts of Maher Law coming due after trial are the sole responsibility of [David], irrespective of when those debts accrued."

David's appellate counsel states he "frankly does not know what the court intended by this finding and order but speculates that the court intended this community property [brokerage] account to be divided equally as of the date of trial with David taking the outstanding loan that he had used to pay off the credit card accounts" and there is "great ambiguity in the court's order dividing that account and the loan against that account." Nevertheless, he contends "[r]egardless of the intent of the trial court in making this division . . . it is error on its face" because sections 2550 and 2622 require those debts to be divided equally.[15]

_____

[15] Section 2550 provides in part: "Except upon the written agreement of the parties, or on oral stipulation of the parties in open court, or as otherwise provided in this division, in a proceeding for dissolution of marriage . . . the

23

There is a remedy for orders that are so ambiguous experienced counsel "frankly does not know what the court intended"—and it's not reversal on appeal. The appropriate remedy is a timely objection on that ground in the trial court. (Code Civ. Proc., § 634.)

David's trial counsel filed a 20-page objection to the proposed statement of decision. But those objections did not address any claimed ambiguity except with respect to the attorneys' fees award, not challenged here. Indeed, counsel made no objections at all regarding the ruling on Maher Law debts.

Trial counsel's failure to call the claimed ambiguity to the trial court's attention does not appear to be an oversight. As Laurie points out, the court denied her request for reimbursement for half the value of the stock David sold to pay Maher Law debt. The court also did not grant Laurie's request for half of the remaining stock and dividends from the brokerage account. Thus, Laurie concludes that the court granted David the entire value of the brokerage account, which well exceeds the $44,407 in credit card debt he paid with the loan. Since David did not contest these points in a reply brief, we assume they are accurate. A windfall might explain why David's trial counsel did not raise the issue. In any event, by failing to object and ask the trial court to clarify the alleged ambiguities in the statement of decision regarding Maher Law debt, David has waived this issue on appeal. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)

---

parties, the court shall . . . divide the community estate of the parties equally."

Section 2622 provides in part: "[D]ebts incurred by either spouse after the date of marriage but before the date of separation shall be divided as set forth in Sections 2550 to 2552, inclusive, and Sections 2601 to 2604, inclusive."

## DISPOSITION

The judgment is affirmed.  Respondent is entitled to costs on appeal.


DATO, J.

WE CONCUR:


AARON, Acting P. J.


IRION, J.